[No. A070538. First Dist., Div. Two. Jan. 16, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD R. MIDDLETON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

20

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**COUNSEL**

Gliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen and Allan Yannow, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LAMBDEN, J.**—Defendant appeals his conviction of first degree murder (Pen. Code, § 187, subd. (a); further unspecified code sections refer to the Penal Code) with the special circumstance of financial gain (§ 190.2, subd. (a)(1)). He alleges the court erred by not giving a sua sponte instruction on the relationship between provocation and first and second degree murder. He also claims ineffective assistance of counsel for failure to request the instruction.

Defendant also contends the court erred by failing to (1) give an instruction on the use of justifiable force to protect property; (2) grant a continuance of the sentencing hearing, because defense counsel had not received the probation report five days prior to the sentencing hearing; and (3) make findings on all the elements of perjury to justify imposing an enhancement on that basis.

We affirm the judgment.

## BACKGROUND

On February 3, 1994, the San Mateo County District Attorney filed a nine-count information against defendant as follows: one count (count 1) of first degree murder (§ 187, subd. (a)); five counts (counts 2-6) of issuing a false check (§ 470); one count (count 7) of unlawful possession of marijuana for purposes of sale (Health & Saf. Code, § 11359); one count (count 8) of unlawful cultivation of marijuana (Health & Saf. Code, § 11358); and one count (count 9) of unlawfully receiving stolen property (§ 496, subd. (a)).

As to the murder count, the district attorney alleged the special circumstance of murder for financial gain. (§ 190.2, subd. (a)(1).) For this count, the district attorney also alleged enhancements for personal use of a firearm (within the meaning of §§ 12022.5, subd. (a), & 1203.06, subd. (a)(1)), and infliction of great bodily injury (§ 1203.075).

Defendant pleaded not guilty and denied the enhancements on February 23, 1994. At trial, defendant admitted the forgery and drug offenses. We discuss the facts of forgery relevant to defendant's conviction of murder for

financial gain, but omit the facts related to the drug offense, since they are not germane to the issues raised in this appeal.

Defendant and the victim, Henry Olson, had known each other since 1983. Defendant was a general contractor and had a construction business, and according to him, he had referred business to Olson. Olson owned a carpet cleaning business.

In 1993, defendant was experiencing severe financial problems. He had filed chapter 13 bankruptcy petitions in 1988, 1991, and March 1993. His chapter 13 plan required him to pay $500 a month to the bankruptcy trustee from May 1993 to May 1994. He owed money on a tort judgment against him and to the Internal Revenue Service for two deeds of trusts. Additionally, he had an unsecured debt of about $35,000, and a mortgage payment of $3,700 per month.

During June and July of 1993, Olson hired defendant to repair his roof. Neighbors observed Olson and defendant arguing about the roof and, according to defendant, Olson refused to pay him for any of the work. Olson had told a neighbor the job was taking too long and costing too much money.

In late July, Olson's friends and neighbors noticed they had neither seen nor heard from him since the middle of July. After Olson disappeared, defendant continued to work on Olson's roof. He told one neighbor he was handling Olson's affairs because Olson was depressed and had taken a trip after recently being diagnosed with Alzheimer's disease. Defendant told another neighbor that Olson was sick and had left on a plane to visit his parents "back East." Defendant claimed he was fixing the house to rent it to a tenant.

Another neighbor testified he became suspicious when he had not seen Olson for about two weeks, because Olson usually told his neighbors when he was leaving. Furthermore, uncharacteristically of Olson, he had left his parked van in a filthy condition and facing the wrong way on the street. The neighbor also noticed defendant removing furniture and other objects from Olson's home. When questioned about his actions, defendant claimed Olson had left because of a family emergency.

On July 31, defendant gave his former wife two bicycles from Olson's garage. On August 5, 1993, he took his son to dinner and used Olson's Discover card to pay the bill for $114.10. He used Olson's white Nissan Maxima to attend a dinner, and he told his former wife he bought tickets to Hawaii to take his son on a backpacking trip.

During this period, defendant's checking account showed significant activity. His checking account had been closed on July 14 for insufficient funds and was reopened on July 21 when defendant deposited a $6,000 check drawn on Olson's account. Defendant also deposited into his accounts two forged checks for $1,000 and checks for $5,000 and $10,000 drawn from Olson's account. In addition, he deposited into his account $2,000 from Olson's Discover account. On August 18, 1993, defendant withdrew $10,000 from his checking account and received a cashier's check for that amount.

On August 8, 1993, Olson's neighbors contacted the police department to report Olson as missing. The next day, a friend of Olson contacted defendant to inquire about Olson's whereabouts. Defendant said Olson had gone on an extended vacation and asked defendant to find a tenant to lease the house.

On August 9, an officer went to Olson's residence and observed defendant removing furniture. Defendant told the officer Olson had called him and told him to remove his belongings and find a renter for the house. Indeed, defendant had placed an advertisement in the local newspaper offering Olson's home for rent and found a potential tenant who paid him $4,600. The sum ostensibly represented a deposit and first month's rent.

On August 17, 1993, Detective Wendy Bear questioned defendant at the station, and defendant claimed the last time he saw Olson was July 20, when he drove him to the airport. Olson, according to defendant, was depressed because his girlfriend "dumped" him. He said Olson called him on July 30 and stated he did not plan to return for about six months to a year, and defendant should take his furniture and find someone to rent his home. Olson, according to defendant, agreed to send him $10,000 to compensate him for this work.

On August 18, Detective Bear and Inspector Mike Dirickson spoke to defendant. After defendant consented to a search of his home, the police found in his fireplace remnants of an envelope and a paper appearing to be a mortgage with Olson's name on them.

The following day, August 19, defendant went to stay a few days at his sister's home in Livermore and asked her to help him find a place to store his truck. The next day he told her he was hiding from the police because he killed a person who owed him money and refused to pay. Later, he told his sister they had a scuffle and the victim fell off the porch and broke his neck. Another rendition communicated to his sister had defendant shooting the victim while in a car and driving the victim and the car off a cliff.

The sister's husband, Rodney Fleig, said defendant told him the two men had argued and defendant diverted Olson's attention by telling him to look at

the trim between the walls and roof. While distracted, defendant shot Olson in the head. Defendant later provided Fleig with another account. Defendant claimed the men argued and he killed Olson because it was either "him or me."

While visiting his sister, defendant elicited the help of his relatives. Fleig, at defendant's request, destroyed defendant's identification. Defendant and his sister went to a lake and rented a boat. While riding the boat on the lake, defendant threw the gun used to kill Olson in the water. Later, Fleig and another friend drove defendant to Siskiyou County. According to Fleig, defendant planned to stay in the wilderness through winter and then hike to Canada. Defendant claimed he went to Siskiyou for a "hiking trip" to clear his head.

On August 23, the police found Olson's body wrapped in a carpet buried below an earthen dam on defendant's property. The dam had been built on August 17. An autopsy revealed Olson had been shot once in the back of the head. On August 24, an officer recovered checks and deposit slips with Olson's name on them from defendant's home.

The police arrested defendant on his hiking trip on September 1, 1993. During a taped interview on September 1, defendant said he killed Olson on July 14. Olson and he, defendant claimed, met at the cottage behind his house to resolve their differences. Olson was stressed and "wanted out." Defendant had been shooting earlier and left his gun in the cottage. He seized the gun and shot Olson. Defendant asserted: "And all I know is that he wanted out. So I helped him. . . . [¶] . . . I shot him in the head. He wanted me to. He couldn't do it himself, so I helped him."

In the latter part of the confession, defendant claimed Olson had come to his house to clean the carpet when the men became engaged in a "push-shove" fight after Olson said he was not going to pay him for the work on the roof. Olson did not know defendant had a gun. Defendant stated: "I pushed him, then he fell up against the wall, and I grabbed the gun and I shot him."

At trial, defendant offered a different account. Rather than killing Olson on the 14th, he now claimed he killed him on July 24. On July 24, Olson came to his house to clean the carpets, but he was angry because defendant had stolen checks from him and placed a mechanic's lien on his property. Defendant was in the cottage behind the house when Olson entered to report he finished cleaning the carpet. Defendant said Olson told him "in a round-about way" he wanted to commit suicide.

Defendant claimed Olson went back to the main house and returned to the cottage a short time later. The men were arguing about the stolen checks, payment for the work on the roof, and the quality of the work when Olson pulled a gun. Defendant claimed Olson told him: "This is it. [¶] . . . I'm ending it between us." Defendant tried to reason with him, but Olson cocked the hammer on the gun. Defendant hit him with his cat's-paw and hammer. As Olson fell, the gun discharged, but defendant did not know where the bullet went.

Defendant ran to the doorway of the cottage and planned to flee, but, according to his trial testimony, he noticed Olson's van was blocking his truck. Defendant remembered he had a gun in the sink; he returned and grabbed the gun, placed the magazine in it, and chambered a round. The wounded Olson, meanwhile, was on the floor looking for his gun. Defendant charged as Olson retrieved his gun. He grabbed Olson by the belt, threw him against the wall, and pinned the hand without the gun against the wall. Olson's hand with the gun remained free. At the same time, defendant pointed his gun to Olson's head and commanded him to drop the gun. Olson said, "just do it," and hit defendant in the ribs, causing defendant's gun to discharge the single shot which killed Olson. Defendant claimed the killing was an accident, and he did not call the police because he was "shocked," "dumbfounded," and "in denial."

Defendant admitted he lied to the neighbors about Olson. He also said he did not kill Olson for financial gain because he wrote the checks prior to Olson's death. Building the dam over Olson's body in mid-August was, according to defendant, just a coincidence, and only related to his desire to place pipes in the ground.

The jury began deliberating on March 28, 1995. On April 4, 1995, after two requests for an explanation of the premeditation instructions, the jury convicted defendant on all counts. The jury also found the special circumstance and firearm-use allegations to be true.

The court sentenced defendant on May 23, 1995. The court imposed a term of life without possibility of parole for count 1. The court added a four-year consecutive term for the firearm-use enhancement. As to the other counts, the court imposed the upper term of three years on count 2, and consecutive terms of eight months each on counts 3, 4, 5, 6, and 9. The court imposed a consecutive term for count 9, receiving stolen property, because it found defendant had lied to the court. The court also added concurrent terms of two years on counts 7 and 8.

## I. *No Sua Sponte Duty to Instruct on Provocation's Relationship to Deliberation*

 Defendant contends the court had a sua sponte duty to provide CALJIC No. 8.73, which advises the jury about the role of provocation in deciding between first or second degree murder. CALJIC No. 8.73 provides: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

Although the defendant did not request CALJIC No. 8.73, he did request CALJIC Nos. 8.40 and 8.42, which explained manslaughter and provocation's role in reducing murder to manslaughter. The court gave CALJIC No. 8.40 and stated: "Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Section 192 (a) of the Penal Code. [¶] There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury. [¶] In order to prove such crime, each of the following elements must be proved: [¶] 1. A human being was killed, [¶] 2. [t]he killing was unlawful, and [¶] 3. [t]he killing was done with the intent to kill. A killing is unlawful, if it was not justifiable."

At the defense's request, the court also gave CALJIC No. 8.42, which provides in pertinent part: "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. [¶] The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment. [¶] If there was provocation, whether of short or long duration, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for

passion to subside and reason to return, and if an unlawful killing of a human being followed such provocation and had all the elements of murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

Furthermore, the court gave standard instructions on first degree murder and second degree murder to the jury. The court did not specifically instruct the jury on provocation's bearing on premeditation and deliberation, but it did instruct the jury as follows: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under sudden heat of passion or other condition precluding the idea of deliberation, it's murder of the first degree."

Defendant argues the court had a sua sponte obligation to give the specific instruction on provocation and first and second degree murder because it involved "the general principles of law relevant to the issues raised by the evidence. [Citations.]" (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) He adds *People* v. *Valentine* (1946) 28 Cal.2d 121, 132 [169 P.2d 1] (*Valentine*) made provocation a general principle of law. Thus, ". . . a sua sponte instruction on provocation and second degree murder must be given 'where the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately' to carry it out. [Citation.]" (*People* v. *Johnson* (1993) 6 Cal.4th 1, 42-43 [23 Cal.Rptr.2d 593, 859 P.2d 673] (*Johnson*).) The failure to give such an instruction, defendant maintains, resulted in prejudicial error.

The People respond that a sua sponte duty to instruct on defenses arises "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913] (*Sedeno*).) The defense's theory of the case, according to the People, was accident; therefore, an instruction on provocation contradicted that theory and was not required. The People also argue provocation, as it distinguishes first degree from second degree murder, is a pinpoint instruction which must only be given if requested by defense counsel. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1117 [2 Cal.Rptr.2d 364, 820 P.2d 588] (*Saille*).) Finally, the People argue, even if the court had a sua sponte duty to instruct, the error is harmless because the alleged error "did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Both counsel confuse the duty to instruct as it relates to a complete defense, partial defense, and defense to an element of the crime. The case law is also somewhat inconsistent on this issue. In an attempt to clarify this area of the law, we specify the court's duty to instruct in each of the above situations and explain why the omitted instruction in this case did not constitute error.

## A. *Duty to Instruct*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (*Sedeno, supra,* 10 Cal.3d 703, 715.)

The court has a sua sponte duty to instruct on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*Sedeno, supra,* 10 Cal.3d 703, 715.) The court has a duty to instruct on the defense "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Id.* at p. 716.) If an instruction relates "particular facts to the elements of the offense charged," it is a pinpoint instruction and the court does not have a sua sponte duty to instruct. (*People* v. *Barton* (1995) 12 Cal.4th 186, 197 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*).)

Provocation, unlike self-defense, is never a complete defense to a crime. Instead, it is an imperfect or a partial defense. Consequently, ". . . it is a shorthand description of one form of voluntary manslaughter." (*Barton, supra,* 12 Cal.4th 186, 200.) "And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder. Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense [or provocation] is the same as its duty to instruct on any other lesser included offense . . . ." (*Id.* at pp. 200-201.)

Since the court in this case did give the instruction on provocation as it bears on manslaughter, the question is whether an instruction relating

provocation to deliberation and premeditation is a pinpoint instruction. If a pinpoint instruction, the court had no sua sponte duty to instruct.

## B. *Provocation and Deliberation*

■ Both first and second degree murder involve an intentional killing with malice. (§ 187, subd. (a).) The difference between first and second degree murder is the former also has the element of deliberation and premeditation. ■ Consequently, the question before us is whether negating deliberation by a theory of provocation constitutes a defense to a crime or a defense to an element of first degree murder.

Defendant cites dicta in *People* v. *Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311] (*Wickersham*) and *Johnson, supra,* 6 Cal.4th 1, to support his claim that the omitted instruction concerns a defense to a crime and the court must give it whenever any evidence in the record supports such a theory. In *Wickersham,* the court stated such an instruction must be given sua sponte "where the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately . . . ." (32 Cal.3d at p. 329.) The court in *Wickersham* found no error for failing to instruct, because the defendant did not rely on a theory of provocation and such a theory contradicted the defendant's claim of accident.

In *Johnson, supra,* 6 Cal.4th 1, 43, the court cited *Wickersham* with approval on the issue of sua sponte instructions on provocation and deliberate intent to kill. The court in *Johnson* also found no error, since the record did not contain evidence supporting such an instruction and provocation contradicted the defendant's alibi defense.

Neither *Wickersham* nor *Johnson* focused on distinguishing the court's duty as it related to an instruction on a complete defense, partial defense, or defense to an element of the crime. Subsequently, the Supreme Court in *Barton, supra,* 12 Cal.4th 186, 197, disapproved of *Wickersham* to the extent it did not differentiate between complete defenses and partial defenses.

Dicta in *Wickersham* and *Johnson* are also inconsistent with *Saille, supra,* 54 Cal.3d 1103. The court in *Saille* found no sua sponte duty to instruct on the relationship between voluntary intoxication and premeditation. (54 Cal.3d at p. 1117.) " '[W]hen a defendant presents evidence [of voluntary intoxication] to attempt to negate or rebut the prosecution's proof of an

element of the offense [deliberation], a defendant is not presenting a special defense invoking sua sponte instructional duties.' " (*Ibid.*) Instead, it is "more like" a " 'pinpoint' " instruction. (*Id.* at p. 1119.) Similarly, the omitted instruction in this case concerned the defense's attempt to dispute the element of deliberate intent, and resembled a pinpoint instruction.

Defendant contends *Saille* is inapplicable to this case. Since the Penal Code eliminated the defense of diminished capacity, defendant argues, voluntary intoxication could only be used as a pinpoint instruction to raise a reasonable doubt as to deliberate intent. In contrast, defendant asserts, provocation is still a defense in the Penal Code (§ 192, subd. (a)); therefore, a sua sponte duty remains regarding provocation. Furthermore, defendant points out provocation, unlike mental defect, is a general principle of law as evidenced by the code section explicitly relating provocation to malice aforethought (§ 188).

Defendant, however, ignores the reasoning underlying *Saille*. Mental defect as it relates to premeditation is not a pinpoint instruction simply because it no longer functions as a defense to murder in the Penal Code. It is a pinpoint instruction because it is not a general principle of law and it relates the factual issues to the defendant's state of mind. As with mental defect and premeditation, the relationship between provocation and deliberate intent "requires a determination of the defendant's subjective state." (*People* v. *Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295 [3 Cal.Rptr.2d 808].) In contrast, provocation as it applies to manslaughter is an objective rather than subjective test, and the Penal Code requires the jurors to consider whether a "reasonable person" would respond in a similar manner.

Further, the Penal Code contains provocation as it relates to manslaughter and malice, but no code section specifically relates provocation to deliberate intent or premeditation. In that context, it is not a general principle of law. *Valentine,* a case upon which defendant heavily relies, implicitly acknowledged that an instruction on provocation and first and second degree murder relates to negating an element of the offense. The court stated: "Deliberate intent, under the statute (Pen. Code, §§ 187, 189) is not an essential element of murder, as such. It is an essential element of one class only of first degree murder and is not at all an element of second degree murder." (*Valentine, supra,* 28 Cal.2d 121, 131-132.)

Recently a Fourth District case, *People* v. *Lee* (1994) 28 Cal.App.4th 1724, 1734 [34 Cal.Rptr.2d 723] (*Lee*), found no sua sponte duty to instruct on provocation's relationship to deliberation, because provocation in that

context is not a defense. Since the instruction "related certain evidence to an element of the crime and attempted to raise a reasonable doubt as to that element," it was a pinpoint instruction. Defendant contends *Lee* incorrectly applied *Saille,* because a mental defect is no longer a defense and is not comparable to provocation. For the reasons stated above, however, we find *Lee* correctly interpreted *Saille* and we agree with the holding and reasoning in *Lee.*

While we conclude the trial court had no sua sponte duty to instruct, we point out the record contained insufficient evidence to trigger any sua sponte obligation to instruct even on provocation and manslaughter.

## C. *No Substantial Evidence in the Record of Provocation*

The court did instruct on the relationship between voluntary manslaughter and provocation; therefore, defendant maintains, the court must have determined sufficient evidence existed in the record to instruct on provocation and first and second degree murder. (*People* v. *Castillo* (1969) 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449] [the trial court's decision to give certain instructions establishes a strong presumption the evidence supports such instructions].) However, the court gave that instruction because defense counsel requested it, and "[t]he fact that [defense counsel] requested a heat of passion instruction for manslaughter does not establish that the evidence would have necessitated a sua sponte instruction." (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1130 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

In determining whether sufficient evidence supported the instruction, we do not refer to the credibility of the evidence. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 151 [125 Cal.Rptr. 745, 542 P.2d 1337].) "[W]here substantial evidence is presented sufficient to inform the court that the defendant is relying upon provocation to show that he did not act with malice aforethought in a prosecution under section 4500, the court must instruct on its own motion on the issue of provocation." (*People* v. *St. Martin, supra,* 1 Cal.3d 524, 531.) The court only needs to instruct when substantial evidence exists and when the evidence is not " 'minimal and insubstantial.' " (*Barton, supra,* 12 Cal.4th 186, 201.)

Defendant's taped confession contained no evidence of provocation. In one version, defendant stated he killed Olson to accommodate Olson's request to be killed. Later, during this same confession, he modified that account and said the men were pushing and shoving when defendant

shot Olson with his gun. In this rendition, Olson neither had a weapon nor knew defendant had a gun, and defendant characterized the altercation as nothing more than a "push-and-shove" argument.

At trial, defendant's story became more elaborate and changed significantly. He testified Olson had a gun and pointed it at him. Defendant hit Olson with his cat's-paw and hammer. While Olson was on the ground, defendant went to the door of the cottage and then returned to get a gun he had left in the sink. He then threw Olson against the wall and pointed his gun at Olson's head. Olson hit defendant in the ribs and the gun accidentally discharged, killing Olson.

The record shows no substantial evidence of provocation at the time the gun discharged. Even assuming the jurors believed defendant's testimony at trial about the initial phase of the interaction, that phase of the altercation had terminated by the time defendant killed Olson. Defendant successfully repulsed the attack by wounding and, at least temporarily, incapacitating Olson. Defendant ran to the door and could have fled on foot or returned to the main house and telephoned the police. Instead he chose to return and get his gun. His return from the doorway represented a distinct and divisible event in the sequence of events and provided him sufficient time to "cool down." ■ "[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—'the assailant must act under the smart of that sudden quarrel or heat of passion.' [Citation.]" (*Wickersham*, *supra*, 32 Cal.3d 307, 327.)

■ In light of our conclusion the record evinced no substantial evidence to support provocation, we find the omitted instruction on premeditation had no reasonable probability of contributing to the verdict of first degree murder for financial gain. (See *Chapman* v. *California*, *supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) The court did instruct on provocation and manslaughter, as requested, despite the record containing insufficient evidence to require such an instruction. Although unnecessary, the instruction obviously did not prejudice defendant. The jurors received the proper instructions on first and second degree murder and manslaughter.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 19.

## IV. *No Error in Failing to Continue Sentencing Hearing*

Defendant contends the court denied him his due process rights by refusing to continue the sentencing hearing when defense counsel moved for a continuance based on receiving the probation report the day of sentencing. Defense counsel did not receive the report until the day of the sentencing hearing, but the record is unclear whether the probation report was available in the court file five days prior to the sentencing hearing. The court in *People v. Leffel* (1987) 196 Cal.App.3d 1310, 1318-1319 [242 Cal.Rptr. 456] (*Leffel*), held the trial court's failure to continue a hearing when defendant did not receive the probation report within the statutory period mandated by section 1203, subdivision (b), made the sentencing hearing fundamentally unfair.

Section 1203, subdivision (b)(2)(D) states: "The report shall be made available to the court and the prosecuting and defense attorneys at least five days, or upon request of the defendant or prosecuting attorney, nine days prior to the time fixed by the court for the hearing and determination of the report, and shall be filed with the clerk of the court as a record in the case at the time of the hearing." Section 1203, subdivision (b), however, applies to a person convicted of a felony and "eligible for probation." This provision does not apply to defendant, because he was convicted of first degree murder for financial gain, making him ineligible for probation.

If a defendant is not eligible for probation, the judge has discretion to order a probation report. (§ 1203, subd. (g).) Once a probation report is ordered, the better practice would be for the judge to grant a requested continuance when it is based on the untimely receipt of the probation report. In the event the judge refuses to continue the sentencing hearing, we hold no error exists unless the defendant can establish prejudice.

The underlying reasons for presuming the sentencing hearing is fundamentally unfair when probation is a possibility do not apply when the defendant is ineligible for probation. The defendant in *Leffel, supra,* 196 Cal.App.3d 1310, 1318, was eligible for probation and section 1203, subdivision (b) applied. The Legislature, therefore, clearly intended the defendant in such situations to be given an opportunity to evaluate and investigate the report. "What the defendant might have been able to object to or to add further to the report cannot be determined . . . ." (*Leffel, supra,* 196 Cal.App.3d at p. 1318.) As already mentioned, section 1203, subdivision (b), does not specifically apply to felons who are ineligible for probation, and such defendants will rarely be able to offer any evidence that could alter the sentence.

In this case, defense counsel requested a continuance and stated he desired a sentencing hearing to strike the special circumstance and to determine the issue of probation. The court had no discretion to strike the special circumstance (§ 1385.1) or issue probation (§ 190.2); defendant, therefore, could not offer any evidence to change the sentence. Further, no prejudice resulted from the sentence for the other charges, since the probation report contained information already presented at trial and the restitution requested was the statutory minimum of $200 plus a 10 percent collection fee (Gov. Code, § 13967).

In a case where the defendant is ineligible for probation, remanding for resentencing would be a waste of resources, since the defendant is unlikely to present any evidence to change the sentencing. Consequently we hold, defendants ineligible for probation, suffer a due process violation only when they establish they received an untimely probation report which resulted in prejudice.

## V. *Alleged Sentencing Error Is Waived*

■ The court erred, defendant contends, because ". . . the sentencing judge is constitutionally required to make on-the-record findings encompassing all the elements of a perjury violation" (*People* v. *Howard* (1993) 17 Cal.App.4th 999, 1004 [21 Cal.Rptr.2d 676] (*Howard*)), and the court in this case did not make such findings. The court imposed a consecutive sentence for the conviction of receiving stolen property because, as the court stated in its tentative ruling, "defendant lied to the court and the jury concerning the entire set of circumstances relating to the killing of Mr. Olson, and the forgery of his checks, and the taking of his property." The court did not specify the findings as they related to the elements of perjury, which are "a willful statement, under oath, of any material matter which the witness knows to be false. [Citation.]" (*Howard, supra,* at p. 1004.)

The People respond that counsel waived raising this issue on appeal because trial counsel failed to object to the enhancement based on a failure to make findings. (*United States* v. *Dunnigan* (1993) 507 U.S. 87, 95 [122 L.Ed.2d 445, 454, 113 S.Ct. 1111] (*Dunnigan*) ["[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out."]; *People* v. *Scott* (1994) 9 Cal.4th 331, 352-355 [36 Cal.Rptr.2d 627, 885 P.2d 1040] (*Scott*).) In *Scott,* the California Supreme Court held the waiver doctrine applies to

"claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (9 Cal.4th at p. 353.) "Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention." (*Ibid.*) The court applied the rule prospectively.

The court in *Scott* did announce significant restrictions on the waiver rule. A defendant does not waive the court's issuing an " 'unauthorized sentence' "—a sentence unlawfully imposed under any circumstances. (*Scott, supra*, 9 Cal.4th 331, 354.) Additionally, waiver does not apply if the sentencing court did not provide a tentative ruling which includes the court's discretionary choices and supporting reasons. (*Id.* at p. 356.)

Defendant concedes the court had discretion to enhance the sentence for perjury. (*Dunnigan, supra*, 507 U.S. 87; *Howard, supra*, 17 Cal.App.4th 999.) Moreover, the court did issue its tentative ruling prior to argument. During argument on the tentative ruling, counsel did not object to the enhancement for perjury and did not object to the lack of findings on each element of perjury. Defendant's sentencing hearing occurred on May 23, 1995, after the *Scott* decision. Since *Scott*'s waiver rule governs this case, defendant cannot object to the enhancement for perjury for the first time on appeal.

## CONCLUSION

We find the court did not have a sua sponte duty to give an instruction on the relationship between provocation and deliberate intent. Such an instruction relates the facts of provocation to the defendant's state of mind and is a defense against an element of first degree murder. Failure to request such an instruction did not constitute ineffective counsel. Further, the court did not err in failing to instruct on justifiable use of force to defend property, since no facts in the record supported such an instruction.

We also reject defendant's request to remand for resentencing. Since defendant was convicted of murder for financial gain and could not receive probation, he suffered no prejudice by receiving the probation report the day of the sentencing hearing especially since his request for a continuance was to raise issues beyond the power of the court. Finally, defendant did not object at the sentencing hearing to the court's finding of an enhancement

based on perjury, barring him from presenting the issue for the first time on appeal.

Accordingly, we affirm the judgment.

Haerle, Acting P. J., and Hodge, J.,* concurred.

On February 7, 1997, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 16, 1997. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.