Filed 2/26/14  P. v. Gonzalez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JESSE GONZALEZ, JR.,<br><br>  Defendant and Appellant. | D063129<br><br><br>(Super. Ct. No. JCF26568) |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony Da Silva and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

In July 2012, a jury found Jesse Gonzalez, Jr., guilty of two offenses:  willful, deliberate and premeditated attempted murder (Pen. Code, 664, §§ 187, subd. (a))[1] with infliction of great bodily injury (§ 12022.7, subd. (a)) causing permanent paralysis (§ 12022.7, subd. (b)) and personal use of a deadly weapon (§ 12022, subd. (b)(1)) (count 1); and assault with a deadly weapon (§ 245, subd. (a)(1)) with infliction of great bodily injury (§ 12022.7, subd. (a)) causing permanent paralysis (§ 12022.7, subd. (b)) (count 2). In October, the court sentenced Gonzalez to life in prison plus six years on count 1:  life in prison for attempted murder with premeditation and deliberation, five years for causing permanent paralysis, and one year for personal use of a deadly weapon.[2]  The court stayed sentence on count 2 and the remaining enhancements.  Gonzalez appeals, contending substantial evidence does not support the conviction of attempted murder with premeditation and deliberation; trial counsel was ineffective because he did not request a modified version of CALCRIM No. 522 regarding provocation; and the court abused its discretion by precluding the jury from privately viewing and discussing video evidence in the jury room during deliberations.

---

[1]     All further statutory references are to the Penal Code.

[2]     Gonzalez contends the amended abstract of judgment erroneously lists the sentence on count 1 as "13 years to life" and must be corrected.  Respondent properly concedes the point.  Additionally, the court did not specify whether the sentence on count 1 carries the possibility of parole.  It does.  (§ 664, subd. (a).)
Gonzalez also contends the $240 restitution fine and the $240 parole revocation fine violate ex post facto laws and must be reduced to $200 each.  The court stated it was imposing the "minimum mandatory restitution fine" of $240.  At the time of Gonzalez's offenses, the minimum restitution fine was $200.  (§ 1202.4, former subd. (b)(1).)  The parole revocation fine must be in the same amount as the restitution fine.  (§ 1202.45, subd. (a).)  Respondent concedes the restitution fine must be reduced.  We agree.

2

THE PEOPLE'S CASE

On Christmas night 2010, Lance Hicks was working at his bar, the Hard Luck Tavern in El Centro. After the tavern closed at 2:00 a.m., three men came to the front door and were turned away by Hicks's wife, Ana Hicks. Within a minute or two, the back door blew open and a boulder that had been holding the door ajar tumbled inside and rolled across the floor. Hicks picked up the boulder, walked to the back door, put the boulder outside and saw the three men. Hicks said something such as, "Why Christmas? Why throw the boulder?" One of the men, Gonzalez, ran at Hicks very fast, crouching low. Hicks was scared and defended himself. He did not recall the ensuing fight, but remembered Gonzalez hugging him and stabbing him in the back. Hicks felt as if his legs disappeared. He fell on his back and Gonzalez got on top of him and began stabbing him. Hicks held up his hand, asked Gonzalez to stop, said he was hurt and asked for help and an ambulance. Ana Hicks and others gathered around. Hicks lost consciousness. His next memory was being in the hospital many days later. He had 15 stab wounds, including wounds to his neck, chest, arm and back. He had a punctured lung. A stab wound to his spine rendered him a paraplegic.

Dorian Gray, a bartender at the Hard Luck Tavern, saw Louis Murillo and two others try to enter the tavern shortly after 2:00 a.m. on December 26, 2010. Ana Hicks asked them to leave and they left. Approximately two minutes later, Gray heard a loud noise outside, then a loud bang on the back door, and "saw a leg leaving the back door." Hicks went outside to investigate. After a minute, Gray walked to the back door, saw a rock holding it open and heard a commotion outside. He retrieved a stun gun from

3

behind the bar and ran outside. Gray saw Hicks lying on his back on the ground. Gonzalez had his knee on Hicks's midsection and appeared to be punching him many times, fast. Murillo and the other person who had entered the tavern were standing nearby. Murillo said, "Let's go." Gray fired the stun gun into the air twice and moved toward Hicks. Gray saw a blade in Gonzalez's hand and realized he was stabbing Hicks. Gray saw Gonzalez stab Hicks nine to ten times, and had the impression stab wounds had been inflicted before he arrived on the scene. There was blood on Gonzalez's hand, on the blade and all over Hicks. Gray attempted to use the stun gun on Gonzalez but it did not appear to have any effect. Murillo and his companion grabbed Gonzalez by the shirt and pulled him away from Hicks. Gonzalez, Murillo and the third person ran away with Gray in pursuit. Gray stopped after running five or ten feet because Hicks said he was hurt and asked for help. Gray unsuccessfully tried to help Hicks get up, then ran to the back door of the Hard Luck Tavern and yelled that Hicks had been stabbed.

Justin Bostic, an off-duty deputy sheriff, was outside the Hard Luck Tavern before the attack. He saw three individuals enter the tavern, leave immediately, pull down a fence adjacent to the tavern and walk through the opening they had created. When Bostic heard yelling, he ran in the direction the three individuals had gone. He saw Hicks lying on the ground in back of the tavern and heard him moaning and groaning. Bostic administered first aid until paramedics arrived. During that time, Hicks lost consciousness several times.

The People introduced into evidence video recordings from surveillance cameras focused on seven areas inside the Hard Luck Tavern. The People's exhibit shows the

4

events depicted in video footage taken inside the tavern, introduced into evidence by Gonzalez and described below.

DEFENSE EVIDENCE

On the night of December 25, 2010, Ramon Bonesi was with Gonzalez and Murillo at Gonzalez's home. They drank beer until around 10:00 p.m., then walked to the Owl bar, where they drank beer and hard liquor. When the Owl closed around 2:00 a.m., they walked to the Hard Luck Tavern. They entered the tavern but were escorted out a minute later because it was closing time. They began walking home, then heard a noise and began running. Bonesi, who was in front, noticed Gonzalez was no longer behind him, and went back to look for him. Bonesi saw a scuffle near the back door of the Hard Luck Tavern. Hicks was on the ground; Gonzalez was on top of him, punching him; and Hicks was fighting back. Bonesi tapped Gonzalez on the shoulder and Gonzalez got up. Bonesi did not see anyone else until Gray came at them with the stun gun. Gonzalez, Murillo and Bonesi ran to Gonzalez's house. Bonesi saw a cut on Gonzalez's arm and asked about it. Gonzalez said he had stabbed someone during the fight. Gonzalez later told Bonesi that he had blacked out and did not remember the incident.

Gonzalez testified that on December 25, 2010, he drank two beers and smoked a marijuana cigarette at home. Bonesi arrived in the late afternoon with an 18-pack of beer. They drank all of the beer and smoked marijuana. Murillo joined them. They drank more beer. Gonzalez drank a total of at least 20 beers. The three men walked to the Owl bar. Gonzalez carried a knife with a four to five-inch blade. At the Owl he drank beer and two or three shots of tequila. He left the Owl, went to the Conga bar and

5

drank more beer. Then, with Bonesi and Murillo, he tried to enter the Hard Luck Tavern. They were unsuccessful. As they left the tavern, Gonzalez saw a big rock. He threw it in the direction of the door, thinking "it would be funny," then ran. He did not remember walking back to Hicks, but did remember Hicks in front of him, yelling and cursing. Hicks hit him in the head a couple of times and kicked him. Gray was behind Hicks and appeared to have a weapon. Gonzalez was scared. He hit Hicks with his fist, and when Gray moved closer, Gonzalez pulled out his knife and struck Hicks in the abdominal area. Gonzalez "blacked out" and did not remember hitting or stabbing Hicks again, but did remember Hicks was on his back, Gonzalez was on top of him and Hicks was grasping his collar. Gonzalez "pushed [Hicks] off" and ran home, discarding the knife on the way. When Gonzalez got home, he realized he had a stab wound. He did not remember much of the evening because he was drunk.

The next day, Gonzalez discarded his bloody clothes in a dumpster. He did not intend to kill Hicks and "didn't plan for this to happen." Gonzalez believed his intoxication might have affected his judgment. He had had problems with anger for a long time, angered easily and sometimes took his anger out on others physically. He had been in quite a few fights. He had been the instigator of approximately 40 percent of those fights.

Psychiatrist John Greene evaluated Gonzalez in June 2012. Gonzalez told Greene that he had problems with anger when he was a child and got into trouble as a result. In high school, he got into a couple of fights a year and started the fights about 40 percent of the time. After he graduated from high school, he was terminated from a job corps

6

program for fighting. Gonzalez suffered from alcohol and methamphetamine abuse, which meant his repeated use had affected "his ability to behave appropriately while he [was] using those substances."[3] Gonzalez reported using alcohol and marijuana at the time of his crime, and Greene believed his intoxication was a factor in the offense and significantly impaired his memory. Selective memory impairment was common in people who drank substantial amounts of alcohol. A person with a history of anger issues and fighting might commit the offense here even without having consumed alcohol. Stress could also lead to misjudgment and rash actions.

Green's conclusions were based on what Gonzalez had reported. If Gonzalez was truthful about the amount of alcohol and marijuana he had consumed, his ability to think rationally would have been substantially impaired, and he "would most likely [have] act[ed] irrationally" and impulsively. Memory impairment was a mental illness, and testing strongly suggested Gonzalez "was not lying about symptoms of mental illness." Gonzalez's account to Green was consistent with what defense counsel had relayed to Green as Gonzalez's account to counsel; this supported Green's opinion that Gonzalez was truthful.

Defense counsel introduced video clips into evidence. A video taken inside the Hard Luck Tavern depicts three men entering through the front door. A blond woman moves toward them, gesturing and pushing one of them in the direction of the door. One of the men also gestures. The three men leave. A man, apparently Hicks, approaches the

---

3       Gonzalez told Greene he had resumed using methamphetamine about a month before the offense.

7

door after the men are outside. Within a minute, he looks toward the back door of the tavern, moves toward the back door and disappears from view. Within seconds, another man, apparently Gray, follows him quickly, holding an object, apparently the stun gun, and also disappears from view. Approximately one minute later, the blond woman, a brunette woman and a man run toward the back of the tavern and disappear from view. Within seconds, the brunette woman comes into view, running from the back door area toward the front of the tavern.

The defense also introduced into evidence a video taken outside the tavern. That video shows a paved area in the foreground and walls and parked cars in the background. Three people are seen running in the background, from left to right, one after the other. Almost immediately, a fourth person follows at a slower pace. A person comes into view on the right and moves toward the fourth person. The fourth person moves back slightly, stretches an arm toward the other person and moves his foot in a kicking motion, but does not touch the other person. The other person moves toward the fourth person, the fourth person reciprocates, and they make contact. Standing close together, they move toward the left and out of view, as the other person hits the fourth person repeatedly. More people appear. There is a flash. Emergency vehicles arrive.

ATTEMPTED MURDER

Gonzalez contends his intoxication and Hicks's provocation (cursing at him after he had begun running away, then kicking and punching him) precluded a finding of attempted murder with premeditation and deliberation.

8

Attempted "willful, deliberate, and premeditated murder . . . shall be punished by imprisonment in the state prison for life with the possibility of parole. . . . The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664, subd. (a).) Willfulness refers to an intent to kill. (See *People v. Concha* (2009) 47 Cal.4th 653, 666.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.] [¶] ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which

9

that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" [Citation.]' [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

A rational jury could have accepted Hicks's version of events and rejected Gonzalez's version. The evidence set forth above, including Hicks's and Gray's testimony, would allow a reasonable jury to conclude that in a short period of time, before he attacked Hicks, Gonzalez considered the circumstances and, after reflection, decided to kill Hicks. Substantial evidence supports the finding of deliberation and premeditation and the conviction of attempted murder.

INEFFECTIVE ASSISTANCE OF COUNSEL

Defense counsel argued that Hicks provoked Gonzalez by yelling, cursing and landing the first blow; Gonzalez acted because of a sudden quarrel and in the heat of passion; he was so intoxicated he acted rashly and without thinking; and this was a case of imperfect self-defense. At counsel's request, the court instructed the jury on the lesser included offense of attempted voluntary manslaughter if "[t]he defendant attempted to kill someone because of a sudden quarrel or in the heat of passion" and "because he was provoked" (CALCRIM No. 603) and on complete and imperfect self-defense (CALCRIM Nos. 505, 604). The court also instructed the jury could "consider evidence of voluntary intoxication in deciding if the People [had] proved . . . deliberation and premeditation" (CALCRIM No. 3426) and that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and

10

premeditated" (CALCRIM No. 601). Gonzalez contends counsel was ineffective because he did not request a modified version of CALCRIM No. 522, instructing that provocation insufficient to reduce attempted murder to attempted voluntary manslaughter may nevertheless support a finding that the attempted murder was not premeditated and deliberate.

The defendant has the burden of showing he received ineffective assistance of counsel, that is, that counsel did not act in a manner expected of a reasonably competent attorney and counsel's acts or omissions prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692.) To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

Here, there was no substantial evidence of provocation; the evidence was, at most, " ' "minimal and insubstantial." ' " (*People v. Middleton* (1997) 52 Cal.App.4th 19, 33.) The record does not demonstrate the lack of a request for a modified version of CALCRIM No. 522 caused Gonzalez any prejudice. (See *People v. Koontz, supra,* 27 Cal.4th at pp. 1085-1086.) This defeats his contention of ineffective assistance of counsel.

### THE JURY'S VIEWING OF THE VIDEO EVIDENCE

During trial, the videos introduced into evidence were played in open court. The court instructed the jury that if it wished to see the videos again, it should send a note

through the bailiff, and the videos would then be played in open court. Soon after the jury began deliberating, the court received a note asking to view the videos "privately (without audience) to discuss among ourselves." The court discussed the note with counsel, who agreed on the following procedure. Because the videos were playable only via a program on the prosecutor's laptop computer, which also contained files the jury was not entitled to see, the jury would watch the videos in open court. The court would suggest to the jurors that each video be played three times, would admonish them not to speak while viewing the videos and would tell them to write another note if they wished to view the videos again. The court informed the jurors of the procedure, and before the videos were played, received a note from the jury asking whether the videos would be played in real time, or if they could be played in slow motion. The court responded the videos would be played in real time, and if the jurors wished to see the videos in slow motion, they should send another note.

At defense counsel's request, the court allowed the jury to gather around the screen to obtain a better view. The videos were played three times. The jury returned to the deliberation room, and a short time later sent the court a note asking to view the video taken outside the Hard Luck Tavern three times frame by frame and once in real time. The court responded that for technological reasons, the video could not be played frame by frame, so it would be played a couple of times at quarter speed and then a couple of times at half speed. The court told the jurors to make a note of any point they would like the video stopped, and the court would try to accommodate any request. The court admonished the jury not to hold any discussions in open court, then had the video played

12

twice at quarter speed and twice at half speed. The court asked the jurors if they wished the video played again at quarter or half speed. The jurors did not ask to see the video again. The court told the jurors to send another note if they had further requests. After the jury left the courtroom, the court stated its belief that the video could not be played more slowly than quarter speed. The prosecutor agreed. Defense counsel did not comment.

The next morning, the jury sent the court a note asking to see the video "at [quarter] speed and [half] speed, three times." Defense counsel told the court that he and the prosecutor "would like to have the jurors review the videos as if they were in a private deliberative area." The court closed the courtroom and directed the jurors not to talk while the video was playing. The court told the jurors they were free to position themselves for the best view. The prosecutor played the video three times each at half speed and quarter speed. The court excused the jurors for further deliberations and asked them to send another note if they had another request.

A little more than one hour later, the court received a note from the jury asking to view the video after the lunch break, three times in real time, two times at half speed and once at quarter speed. After the lunch break, the court told the jurors to position themselves for the best view and admonished them to refrain from discussion. The video was played at the three speeds requested. The jury returned to the deliberation room. After deliberating for a period lasting between one and one-quarter hour and two hours 40 minutes, the jury notified the court it had reached a verdict.

Gonzalez contends that requiring the jurors to view the videos in open court, without simultaneously discussing what they saw, and without "independently starting, stopping and rewinding the video clips as much as they wanted," "prevented the jurors from deliberating and evaluating the evidence in a meaningful manner."

"[S]ection 1137 . . . provides that the jurors, upon retiring for deliberation, may take with them all papers which have been received into evidence (except depositions). Moreover, there is judicial authority that transcripts of tape-recorded testimony may be taken into the jury room." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 473.) Nevertheless, "what may be taken by the jury into the jury room is left to the sound discretion of the trial court." (*People v. Walker* (1957) 150 Cal.App.2d 594, 603.)

Here, the court did everything possible to accommodate the jury's requests to view the videos. The court allowed the jurors to position themselves so as to have a clear view, and to view the videos at various speeds, as many times as they wished. The only limits the court imposed were those required by technology and the extraneous material on the prosecutor's laptop that the jury was not entitled to see. There was no error.

## DISPOSITION

The trial court is directed to correct the abstract of judgment to provide the sentence on count 1 is life in prison with the possibility of parole plus six years, and the restitution fine and parole revocation fine are $200 each. The court is directed to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

McDONALD, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

15