[No. B128162. Second Dist., Div. Six. Oct. 25, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD JAMES BOHANA, Defendant and Appellant.

## COUNSEL

Law Offices of Dennis A. Fisher, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Steven D. Matthews, Valerie A. Baker and David Cook, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—A jury convicted Donald James Bohana of the second degree murder of Delores Velma Jackson. (Pen. Code, §§ 187, 189.)[1] He appeals contending there is insufficient evidence that he acted with express or implied malice, the victim's death was excusable as "committed by accident

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

and misfortune" (§ 195), and that the trial court erred in failing to instruct the jury sua sponte on excusable homicide and involuntary manslaughter. We affirm.

*Facts*

In 1994 appellant was dating Delores Jackson. On the night of August 26, 1994, Jackson arrived at appellant's house for a late dinner. At 3:34 a.m. on August 27, appellant called 911 to report that "someone fell in my pool" and was "drowning." Paramedics arrived at the house seven or eight minutes later and found appellant kneeling near Jackson. They were both nude. Jackson was lying on her back, with her head and neck propped up against a tree several yards away from the pool. She was not breathing and had no heart beat. Although the area underneath Jackson was wet, her skin was dry and cool to the touch, and her long hair was damp rather than wet. Jackson expelled a large amount of water and alcohol when a paramedic administered the first CPR compression. This indicated to the paramedic that no prior attempts had been made to resuscitate Jackson.

Paramedics remained at appellant's house for about 30 minutes as they attempted, unsuccessfully, to revive Jackson. During this period, appellant went into the house to dress. He made at least two telephone calls before the ambulance left to take Jackson to the hospital. One of the paramedics testified that appellant had a "lost" expression on his face, appeared to be in a state of disbelief about what had happened, and seemed concerned about Jackson. Two others described appellant as nonchalant and unemotional.

Los Angeles County sheriff's deputies arrived at appellant's home about 4:05 a.m. One deputy opined that appellant was drunk and described his demeanor as "belligerent and uncooperative." Another testified that appellant did not appear to be intoxicated and that he was "dazed" and "withdrawn." Appellant would not answer questions posed by the deputies but made telephone calls to family members during which he appeared to have no difficulty communicating.

About 7:45 a.m., appellant described the events preceding Jackson's death to homicide detective David Watkins. According to appellant, Jackson arrived at his home about 10:30 p.m. They drank alcohol, talked, listened to music and danced for some time before disrobing and getting into the jacuzzi. They spent somewhere between 20 to 40 minutes in the jacuzzi and then swam to the deep end of appellant's backyard swimming pool. Appellant eventually got out of the water and sat at a table while Jackson continued swimming.

After Jackson swam to the deep end of the pool, she touched the pool light and turned to swim back toward the jacuzzi. Appellant noticed that Jackson was struggling under the water. He dove in to help her but she resisted. He was not able to bring her to the surface. Appellant got out of the water and retrieved a pool pole. He extended the pole to Jackson, so she could grab it. She did not. Appellant realized the pole was too short and dropped it in the water. He got another, longer pole with a leaf net attached to the end. Appellant tried to get Jackson to grab this pole, but she did not. At this point, appellant called 911. After giving his address, he ran back outside.

Appellant noticed that Jackson was no longer moving and was motionless at the bottom of the pool. He dove in again, put his hands underneath her arms, picked her up so that she was facing him, and swam to the surface of the water. Appellant placed Jackson on the deep-end deck. He did not describe how he got Jackson's body out of the deep end of the pool. In that part of the pool, the water is eight feet, seven inches deep.

After appellant placed Jackson on the deck, he rolled her onto her stomach and pushed on her lower back in an effort to resuscitate her. When that failed, he rolled her on her back and applied pressure to her stomach. He also put his mouth on hers and tried to suck the water out of her lungs. Appellant was trying to resuscitate Jackson when the paramedics arrived. He did not answer their questions because he was "frightened." Appellant said Jackson was a strong swimmer and had no idea why she drowned.

William Richardson, a retired lifeguard and expert in water safety, testified that an unconscious person retrieved from a swimming pool would have scrapes on the buttocks and hips and probably bruises on the wrists. Jackson had no such wounds. In Richardson's opinion, her recovery from the pool could not have occurred in the manner described by appellant. One of the paramedics agreed that it is "almost impossible" to lift an unconscious person onto a pool deck when the rescuer is in the deep end of a swimming pool.

While they were working with Jackson, the paramedics noticed that she had "numerous" bruises on her upper chest and breasts, a torn earlobe, and a laceration on her shoulder. An autopsy concluded that these injuries and many other bruises and abrasions were inflicted by blunt force trauma less than four hours before Jackson's death. Jackson also had multiple lacerations to her lips and tongue and a blackened right eye. There were several small scratches on her face and chin and she had traumatic injuries to both the left and right sides of her scalp. Both of Ms. Jackson's eyes had petechia hemorrhages, indicative of death by asphyxia, i.e., suffocation. She had a blood-alcohol level of .22 percent at the time of death.

The physical injuries were not sufficient to cause Jackson's death but could have rendered her unconscious. The injuries were consistent with Jackson's having been beaten. They were inconsistent with injuries sustained during the rescue or resuscitation efforts described by appellant and the paramedics. Her bruises and scalp wounds were not consistent with having been hit by the pool poles. Jackson did not have "washer woman's skin," or wrinkling of the skin on her hands. The forensic pathologist opined that wrinkling occurs after hands are immersed in warm water for 15 or 20 minutes. If a person died while in the water, the "washer woman's skin" would remain after death.

Jackson's three children, her close friends and other family members found appellant's account of her drowning extremely unlikely. According to these witnesses, Jackson could not swim, had a morbid fear of water and refused to enter a swimming pool or even to wade in the ocean. She would very rarely sit in a jacuzzi. Jackson's eldest son testified that a few weeks before her death, Jackson told him she was trying to learn how to swim and that appellant was going to teach her. She said that she stood on the stairs of the pool, but did not say she swam. He believed that if Jackson had been swimming she would have told him.

Jackson's friend, Brenda Richie, testified that in August 1994, they discussed taking swimming lessons together because neither could swim. Amy Winer, Jackson's friend and hairdresser, testified that Jackson said she'd been going in the jacuzzi with appellant. Winer noticed some bruises on Jackson's arms. Jackson told Winer that she had been going into the pool with appellant and the bruises were from appellant holding her up in the water. Jackson gave the same explanation to friend Peggy Rowe when Rowe noticed bruises on Jackson's upper arms.

At trial, appellant testified that Jackson could swim. He explained that Jackson was swimming underwater when he first noticed her struggling. He dove into the pool and grabbed for her arm, but missed. He could not stay down, so he swam up to the surface and dove down again. He was again unable to rescue Jackson. Appellant left the pool and got the pole and leaf net. He held this out to Jackson but then realized it was too short. Appellant dropped the pole into the pool and got a newer, longer pole from the side of his house. More than once, appellant got the pole underneath Jackson's body and began lifting her to the surface, but she fell off. When he managed to drag Jackson up to the surface and over to the side of the pool, appellant placed his left elbow on the pool deck, slid into the pool and then flipped Jackson over from the water onto the deck. He attempted to resuscitate her and, when he thought he heard her breathe, ran inside to call paramedics.

Appellant believed that Jackson's injuries were caused by the poles and that she may have hit her head when he put her on the deck.

*Trial Theories*

The prosecution's theory at trial was that appellant was guilty of either first or second degree murder. Appellant beat Jackson, causing the scalp wounds, black eye, bruises and other injuries. Jackson either fell into the pool during the beating or was pushed into the pool by appellant. She was unable to rescue herself because she could not swim and was injured or unconscious from the beating.

Appellant's theory at trial was that he committed no act at all, let alone a criminal one: Jackson went into the pool's deep end voluntarily and became unable to swim because she had a seizure or passed out from drinking too much alcohol. Her physical injuries were caused by the pool poles appellant used during his attempted rescue.

As we shall explain, appellant "may not change his theory of the case for the first time on appeal. [Citations.]" *People v. Borland* (1996) 50 Cal.App.4th 124, 129 [57 Cal.Rptr.2d 562].) His express tactical decision to not have the jury instructed on involuntary manslaughter was a gamble which, with the benefit of hindsight, may not have been wise. However given the facts and circumstances, we cannot say appellant's decision was unreasonable at the time it was made. But to now grant relief would allow appellant to gamble on a favorable result at trial, knowing that if he did not prevail there, he would prevail on appeal. (See *People v. Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People v. Jones* (1980) 111 Cal.App.3d 597, 605 [169 Cal.Rptr. 28].)

*Substantial Evidence of Second Degree Murder*

Appellant contends the evidence is insufficient to support his conviction of second degree murder. He argues that there is no evidence he acted with express or implied malice. Alternatively, he argues that the death was excusable as "committed by accident and misfortune" and therefore excusable under section 195. We are not persuaded. The record contains sufficient evidence that appellant acted with implied malice by forcing Jackson, a nonswimmer, into the deep end of his swimming pool either before or after beating her.

Our role in reviewing the sufficiency of the evidence in a criminal case is a limited one. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26

Cal.Rptr.2d 23, 864 P.2d 103].) We examine the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Akins* (1997) 56 Cal.App.4th 331, 336 [65 Cal.Rptr.2d 338].) Substantial evidence is " 'evidence which is reasonable, credible, and of solid value.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Although "mere speculation cannot support a conviction" (*People v. Marshall, supra,* 15 Cal.4th at p. 35), the trier of fact is entitled to draw reasonable inferences from the evidence and we will " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rayford* (1994) 9 Cal.4th 1, 23 [36 Cal.Rptr.2d 317, 884 P.2d 1369], quoting *People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *People v. Henley* (1999) 72 Cal.App.4th 555, 561 [85 Cal.Rptr.2d 123].)

The standard of review remains the same in a case based upon circumstantial evidence. (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) " '[W]e must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)" (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.) We must decide whether the circumstances reasonably justify the jury's findings, but "our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment." (*People v. Proctor, supra,* 4 Cal.4th at p. 529.)

■ Second degree murder is the unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].) "Generally, the intent to unlawfully kill constitutes malice." (*People v. Breverman* (1998) 19 Cal.4th 142, 153 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Express malice murder requires an intent to kill. (§ 188; *People v. Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Implied malice murder requires "an intent to do some act, the natural consequences of which are dangerous to human life. 'When the killing is the direct result of such an act,' the requisite mental state for murder—malice aforethought—is implied. (CALJIC No. 8.31 . . . .) In such circumstances, '. . . it is not necessary to establish that the defendant intended that his act would result in the death of a human being.' (*Ibid.*)" (*People v. Swain* (1996) 12 Cal.4th 593, 602-603 [49 Cal.Rptr.2d 390, 909 P.2d 994], italics omitted.)

 Here, substantial evidence supports the jury's finding of second degree murder. Indeed, the jury could have found that this was a first degree murder. Several witnesses testified that Jackson could not swim and was afraid of water and swimming pools. Jackson had many blunt force traumatic injuries which were not, in the opinion of three expert witnesses, the result of appellant's purported rescue efforts. Most of Jackson's injuries were inflicted within four hours before her death, at a time when it is undisputed that she was alone with appellant at his house. The blows to Jackson's head likely rendered her unconscious. At the time of her death, she had a blood-alcohol level of .22 percent and had been in the water for less than 20 minutes.

A rational trier of fact could and did draw the logical and reasonable inference from this evidence that Jackson did not voluntarily enter the deep end of the pool but was instead forced into the water by appellant, either before or after he beat her to unconsciousness. (See Evid. Code, § 600, subd. (b).) Because she was unconscious, intoxicated and unable to swim, Jackson could not rescue herself. The wounds on Jackson's body and the expert testimony provide an evidentiary basis for the jury to conclude that appellant intentionally beat Jackson, rather than accidentally inflicting injuries while attempting to rescue or resuscitate her. A rational jury could find that appellant acted with implied malice when he forced an injured, unconscious nonswimmer to remain in the deep end of his swimming pool until she drowned.

 Appellant essentially invites us to reweigh the evidence when he contends that the jury's verdict is based solely upon speculation concerning whether Jackson voluntarily entered the pool and the precise sequence of events preceding her death. We must, of course, decline the invitation. In this context, "speculation" simply means a guess, i.e., a conclusion not based upon a logical, reasonable, and therefore, lawfully drawable inference from the evidence. As phrased in *People v. Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843]: "A reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " (See also *People v. Bloom* (1989) 48 Cal.3d 1194, 1235 [259 Cal.Rptr. 669, 774 P.2d 698] (conc. and dis. opn. of Mosk, J.).) Somewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails. When this happens, the inference becomes irrational speculation. Here, the inferences drawn by the jury were rational.

 We point out that there was some evidence that Jackson became less fearful of water in the weeks before her death and that she had minor

bruises when she arrived at appellant's house that night. There was no evidence that appellant had a motive to kill Jackson and the prosecution did not present to the jury a single, definitive scenario of his conduct toward Jackson. These circumstances could have led the jury to a different result but they do not, as a matter of law, undermine the substantial evidentiary support for the verdict. Motive is not an element of the offense and the prosecution is not required to present the jury with a blow-by-blow account of the victim's final moments.

### Sua Sponte Instruction on Excusable Homicide

Appellant contends the trial court erred in failing, sua sponte, to instruct the jury on excusable homicide under section 195. The statute provides: "Homicide is excusable in the following cases: [¶] 1. When committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent. [¶] 2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner." There was no error because there is no substantial evidence that Jackson's homicide was "committed" by accident or misfortune within the meaning of section 195.

■ The trial court has a duty to instruct, sua sponte, "on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) This includes the duty to give instructions concerning defenses on which the defendant relies or which are not inconsistent with the defendant's theory of the case. (*People v. Breverman, supra,* 19 Cal.4th at p. 157.) The trial court has no duty to instruct on a defense that is not supported by substantial evidence. (*People v. Middleton* (1997) 52 Cal.App.4th 19, 33 [60 Cal.Rptr.2d 366].)

"When a defense is one that negates proof of an element of the charged offense, the defendant need only raise a reasonable doubt of the existence of that fact." (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 390 [88 Cal.Rptr.2d 111]; see *People v. Tewksbury* (1976) 15 Cal.3d 953, 963 [127 Cal.Rptr. 135, 544 P.2d 1335].) The claim that a homicide was "committed by accident and misfortune" (§ 195), is such a defense because it "amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime." (*People v. Lara* (1996) 44 Cal.App.4th 102, 110 [51 Cal.Rptr.2d 402]; see also *People v. Gonzales, supra,* 74 Cal.App.4th at p. 390.)

Appellant's trial theory of the case was that Jackson voluntarily entered the deep end of the swimming pool and "accidentally" drowned because she suffered a seizure, passed out from drinking or had some other, unknown ailment.[2] Appellant testified Jackson might have sustained some injuries because he hit her with the pool poles during his rescue attempts. This factual scenario provides no substantial evidentiary support for an accident instruction because appellant denied committing any act at all which could be characertized as accidental. Under his theory of the case, appellant only failed to prevent an accidental drowning. He did not accidentally cause Jackson to enter the deep end of the pool and drown. The instruction he now claims was erroneously omitted would have contradicted his theory of the case because it would have implied that some "accidental" conduct by appellant caused Jackson to enter the deep end of the pool. In this situation, the trial court had no duty to give the traditional "misfortune by accident" CALJIC No. 4.45 instruction sua sponte. (*People v. Breverman, supra,* 19 Cal.4th at p. 157.)[3]

Appellant concedes that the jury rejected his version of the facts. He contends that the trial court was nevertheless obliged to instruct on the accident defense because the jury could have found that Jackson "accidentally" fell into the pool while fighting with appellant. Had there been evidence of a physical altercation near the deep end resulting in the victim's falling into the pool, appellant would have been entitled to an accident instruction. However, there was no substantial evidence to support an "accidental falling in" theory. Appellant denied that he beat Jackson at all or that he caused her to accidentally enter the deep end of the pool. The prosecution claimed that both the beating and the drowning were intentional. Appellant claimed that Jackson intentionally swam to the deep end and drowned there. In light of the unique facts and appellant's trial theory of defense, there was no sua sponte duty to give CALJIC No. 4.45.

### Sua Sponte Instruction on Involuntary Manslaughter

■ Appellant contends the trial court erred by failing to instruct sua sponte on involuntary manslaughter. Involuntary manslaughter may be a lesser included offense of murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Prettyman* (1996) 14

---

[2]In closing argument defense counsel said: "This lady was smashed and she had been in the jacuzzi, and she was not an experienced swimmer, and she passed out. Isn't that the most reasonable explanation? She passed out. That's really what happened in this particular case." "The sadness about his case is that it was an accident. . . ."

[3]CALJIC No. 4.45 provides: "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show [no] [neither] [criminal intent [n]or purpose,] [ nor] [criminal] negligence,] [he] [she] does not thereby comit a crime."

Cal.4th 248, 274 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) It occurs where a killing is committed "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Depending on the circumstances surrounding its commision, battery may be the predicate misdemeanor for a conviction of involuntary manslaughter. (*People v. Cox* (2000) 23 Cal.4th 665, 676 [97 Cal.Rptr.2d 647, 2 P.3d 1189]; *People v. Wells* (1996) 12 Cal.4th 979, 988 [50 Cal.Rptr.2d 699, 911 P.2d 1374].)

A trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense that are supported by substantial evidence. (*People v. Breverman, supra,* 19 Cal.4th at p. 162.) In this context, substantial evidence is evidence from which a jury of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." (*Ibid.*) Appellant contends the trial court was obliged to instruct on involuntary manslaughter because reasonable jurors could have found that he committed "misdemeanor manslaughter" by beating Jackson, causing her to fall into the pool where she drowned.

Even if Jackson's blunt force traumatic injuries and her inability to swim provide evidentiary support for instructions on involuntary manslaughter, the trial court's decision not to give those instructions was invited error. The trial court offered to instruct on involuntary manslaughter. For what defense counsel expressly described as tactical reasons, appellant objected to any such instructions. He may not successfully complain of this invited error. (*People v. Barton* (1995) 12 Cal.4th 186, 198 [47 Cal.Rptr.2d 569, 906 P.2d 531]; *People v. Lara* (1994) 30 Cal.App.4th 658, 673 [35 Cal.Rptr.2d 886].)

*Section 1138*

■ Finally, appellant contends that the trial court's decision not to instruct on involuntary manslaughter in response to the jury's questions violated section 1138. Section 1138 provides, in pertinent part, that, when the jury "desire[s] to be informed on any point of law arising in the case, . . . the information required must be given . . . ." Again, we are not persuaded.

During its deliberations, the jury asked: "Can there be another ruling re: a provocation to be sufficient to reduce the homicide to manslaughter[?] . . . Are guilty and first degree and second degree or not guilty our only options?" Appellant's trial counsel unsuccessfully moved for a mistrial on the ground the trial court erred in instructing the jury that provocation should

be considered "for the bearing it may have on whether the defendant killed with or without deliberation and premeditation." (CALJIC No. 8.73.) Defense counsel did not request that the jury be instructed on involuntary manslaughter. Relying on counsel's earlier objection to such instructions, the trial court answered the jury's first question by instructing it to re-read CALJIC No. 8.73. It answered the second question, "Yes."

Where, as here, appellant consents to the trial court's response to jury questions during deliberations, any claim of error with respect thereto is waived. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Moreover, because the trial court based its responses on appellant's earlier objection to the involuntary manslaughter instructions, the error was invited. (*People v. Barton, supra,* 12 Cal.4th at p. 198.)

### Conclusion

The judgment is affirmed.

Gilbert, P. J., and Perren, J., concurred.

A petition for a rehearing was denied November 22, 2000, and appellant's petition for review by the Supreme Court was denied February 14, 2001.