Filed 1/13/23 P. v. Gregory CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES WALTER GREGORY,<br><br>    Defendant and Appellant. | C095512<br><br>(Super. Ct. No. STK-CR-FE-2020-0011343) |

Defendant Charles Walter Gregory lured Jose Bautista and Nateja Bragg to Stockton with the promise of selling Bautista a car. Bautista and Bragg drove from Modesto to defendant's location in Bragg's car. When they arrived, defendant got in the back seat, and the threesome drove to another location, a short distance away. Defendant ultimately shot Bautista and Bragg in the back of the head from the back seat, ending their lives. He then took their cell phones and left the scene of the murder. However, in defendant's apparent haste to leave the car, he left his own cell phone on the rear

1

floorboard, beneath the front passenger's seat. An analysis of this cell phone provided much of the circumstantial evidence used to prove defendant's identity as the killer, as we describe in greater detail below.

Defendant was convicted by a jury of two counts of first degree murder. With respect to each count, the jury also found true a multiple-murder special circumstance allegation, as well as various firearm enhancement allegations. The trial court sentenced defendant to serve two consecutive indeterminate terms of life without possibility of parole (LWOP) for the murders, plus a consecutive indeterminate term of 25 years to life for intentionally discharging a firearm causing death. The trial court struck the firearm enhancements attached to count 2 in the interest of justice.

On appeal, defendant contends: (1) the evidence is insufficient to support his murder convictions; and (2) the trial court prejudicially erred by instructing the jury with CALCRIM No. 372 on flight from the scene of a crime. As we explain, the evidence is sufficient to prove defendant committed two first degree murders in this case. The evidence also supports the trial court's decision to instruct the jury on flight.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Defendant does not challenge the sufficiency of the evidence supporting the conclusion that Bautista and Bragg were murdered, or that he was with them about an hour before they were shot to death, having scheduled the meeting with the promise of selling Bautista a car. Nor does he dispute the fact that his cell phone was found in the back of Bragg's car. He does dispute being the one who killed them. We therefore provide a fairly condensed statement of the facts leading up to the murders, focusing specifically on the evidence establishing defendant's identity as the murderer.

On September 29, 2020, defendant used a Facebook account under the name Elko Husk to list a car for sale on Facebook's marketplace. That afternoon, Bautista sent

2

defendant a direct message through the platform asking whether the car was still available. Defendant responded that evening with a thumbs-up emoji.

The next day, Bautista and defendant exchanged direct messages about the condition of the car and its registration. When Bautista expressed interest in buying it, defendant responded: "No problem. You want to meet right now?" Bautista asked for defendant's phone number. Defendant gave him the number associated with the cell phone that would eventually be found in Bragg's car. After a short call from Bautista to defendant, most of the communication continued via Facebook. Just after 6:00 p.m., defendant sent Bautista a direct message with an apparent address: "2124 Tillie Lewis." Tillie Lewis Drive is a street in Stockton near where defendant lived. However, that specific address did not exist. Defendant also told Bautista to call him when he was close.

At 6:45 p.m., Bautista and Bragg, who was Bautista's "off and on" girlfriend, left Bragg's house in Modesto in Bragg's car. Bautista drove and Bragg sat in the front passenger seat. Around the same time, Bautista sent his sister a text message saying he was on his way to buy a car. At 6:53 p.m., defendant called Bautista. Four minutes later, defendant sent Bautista a text message with a new address: "2157 Saint Lakes Way." This address was directly across the street from where defendant lived. Bautista replied: "On my way." At 7:21 p.m., Bautista sent another text saying he was "six minutes away." Two minutes later, defendant responded with turn-by-turn directions from the freeway to defendant's location. At 7:30 p.m., Bautista called defendant, apparently to let him know they arrived.

Bautista and Bragg were murdered an hour later and about a mile away, near the intersection of Kansas Street and Lever Boulevard. Bautista was shot twice from behind while seated in the driver's seat of Bragg's car. Bragg was also shot from behind while seated in the front passenger's seat.

3

With respect to Bautista's injuries, one of the bullets struck him in the right cheek, fracturing the cheekbone, traveling through the sinus cavity, and exiting through the left eye. This wound did not immediately kill Bautista, but caused him to aspirate a significant amount of blood. The other bullet grazed Bautista's right shoulder and struck the base of his skull, fracturing the skull and severing the cervical spinal cord. This bullet then traveled through the right side of his brain and lodged in the frontal bone. This wound would have caused Bautista's immediate incapacity and death. The bullet that ended Bragg's life struck the back of her head, fracturing her skull, and then traveled through the right side of her brain and exited through the right temple.

The bullet retrieved from Bautista's frontal bone was determined to be of "medium-sized caliber," such as a nine-millimeter. Additionally, while the forensic pathologist who performed the autopsies could not determine the distance between the gun's muzzle and Bragg's head when that shot was fired, the presence of stippling around the entrance wound to Bautista's right cheek indicated that shot was fired from a distance of between six inches and a foot and a half. Based on the foregoing, there can be no serious dispute that the shooter was seated in the back seat when these fatal shots were fired.

Bragg's car was apparently running, with the headlights and windshield wipers on, when Bautista and Bragg were killed. It rolled to a stop on the east side of Kansas Street, south of Lever Boulevard, facing the wrong direction. At 8:30 p.m., a nearby surveillance camera captured the sounds of "a female screaming," followed by three "rapid gunshots," and then "the same voice from before the gunshots screaming or saying something very loudly."

Within about 10 minutes of the shooting, a motorist drove past the car on his way to dinner and thought that someone abandoned it. When he again drove past the car after dinner, he called the police to report an abandoned car. Police and paramedics arrived just before 10:00 p.m. The engine was still running, the headlights and windshield

4

wipers were still on. Bautista and Bragg were pronounced dead at the scene. Bragg's purse was beside her on the passenger's side floorboard. Eight hundred dollars ($800) in cash was located beside Bautista in the driver's side door pocket. Their cell phones were not located inside the car.

A nine-millimeter shell casing was located in front of the car, directly to the southeast. Another nine-millimeter shell casing was found inside the car, on the floorboard, between the front passenger's seat and the door. As mentioned previously, defendant's cell phone was found inside the car, on the rear floorboard just beneath the front passenger's seat. An analysis of this cell phone provided police with the call log and text message history described above. An expended bullet was also found in the air vent in the front passenger compartment.

Latent fingerprints were lifted from various locations inside and outside the car. Defendant's prints were a match for latent prints taken from the driver's door handle, the outside of the driver's side rear door, and his cell phone. DNA samples were also taken from various locations inside and outside the car and compared to the DNA profiles for defendant, Bautista, and Bragg. The only result relevant for our purposes is that a mixture of DNA was found on defendant's cell phone that was "11 quattuordecillion times more likely to be observed" if defendant, Bautista, and Bragg were the contributors to that mixture than if three unknown individuals were the contributors, providing "very strong support" for the conclusion that their DNA was in fact on the cell phone.

We finally note that defendant was living in an independent living home directly across the street from where he had Bautista and Bragg meet him on September 30, 2020. While defendant paid rent for the entire month of October, he did not stay at the house after the murders. About a week later, he stopped by to tell the operator of the home that he was moving out and collected his belongings. Defendant was located and arrested about two weeks after the murders. An analysis of defendant's new cell phone revealed the following in a "note" dated October 3: "Rental place closed. Another car." On

5

October 8, there was a search on the phone for the William P. Hobby Airport in Houston. The following week, there were searches for hotels in Texas. This cell phone also had associated social media accounts, including an Instagram account used to offer two nine-millimeter handguns for sale.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his murder convictions. We do not agree.

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence— that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt. [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable

6

doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Id.* at pp. 357-358.)

Defendant does not dispute that Bautista and Bragg were shot to death in Bragg's car near where defendant lived at around 8:30 p.m. He also candidly admits the evidence supports reasonable inferences that he offered to sell Bautista a car; arranged to meet Bautista at an address across the street from where defendant lived; and the meeting happened around 7:30 p.m. Defendant further admits his fingerprints were found on the driver's side exterior of Bragg's car; his cell phone was found in the back; one of the bullets that struck Bautista was consistent with a nine-millimeter round; a nine-millimeter shell casing was found inside the car; another such casing was found outside the car; and defendant offered to sell two nine-millimeter handguns after the murders. According to defendant, however, the "fatal hole" in the evidence is that there is "no evidence whatsoever of what occurred during the hour between when Bragg and Bautista[] met [defendant] at 7:30 and their murders at 8:30." While we agree the evidence does not establish what transpired during this hour time period, we conclude this evidentiary "hole" is nowhere near "fatal" to defendant's convictions.

We begin by noting, as the prosecutor argued in closing, the jury could have reasonably inferred that defendant lured Bautista and Bragg to Stockton under "the false pretense that there was a car for sale." Defendant calls this "pure speculation" and argues there was no evidence that he did not own the car he posted for sale on social media. Perhaps, defendant suggests, it was parked across the street from where he lived, at 2157 Saint Lakes Way, since that was the address he gave to Bautista. However, that was not the only address defendant gave to Bautista. He also gave him a nonexistent address on Tillie Lewis Drive. Providing both addresses, one of which did not exist, and neither of which were where defendant lived, strongly suggests he was not being honest with

7

Bautista. Moreover, if defendant's car was parked where Bautista and Bragg met him, there would have been no reason for him to get in the back of Bragg's car. The fact that he did get into the back of the car is supported by the fact that his cell phone was found on the rear floorboard just beneath the front passenger's seat, and his fingerprints were found on the outside of the driver's side rear door. Viewed together, as we must, this evidence suggests that defendant told Bautista and Bragg that the car was located elsewhere and got into the back seat of Bragg's car in order to lead them to it.

Defendant acknowledges the foregoing physical evidence, but also notes his DNA was not found inside the car, except on his cell phone, and argues "[a] not unreasonable interpretation of this evidence is that while [defendant] stood outside the car speaking to Bautista and Bragg, his phone fell inside the car and remained there unnoticed." Even if we were to agree that this possibility is not unreasonable, the conclusion that defendant got in the back seat is *at least* as reasonable an inference to draw from the evidence, and "[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 358.)

Nevertheless, defendant argues "even assuming [he] had gotten into Bragg's car at 7:30, the People presented no evidence whatsoever to prove he was there an hour later and murdered Bragg and Bautista." We disagree. "[T]he prosecution is not required to present the jury with a blow-by-blow account of the victim's final moments." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370.) This observation applies equally to the final hour of Bautista and Bragg's lives. As we have already explained, the evidence is sufficient to support a reasonable inference that defendant lured them to Stockton under the false pretense of selling Bautista a car, and then got into the back seat of Bragg's car in order to direct them to a different location, ostensibly the location of the promised car. As defendant acknowledges, if the foregoing is true, a "conceivable motive to do so

8

would be to rob [Bautista]" of the money he brought to make the purchase. Defendant argues, however, that "it defies logic he would have left Bautista's cash, or Bragg's purse, behind" if his motive was to commit a robbery. This was certainly something the jury could consider in determining defendant's guilt. But it does not undermine the sufficiency of the evidence for three reasons.

First, the prosecution was not required to prove motive. (*People v. Bohana*, *supra*, 84 Cal.App.4th at p. 370.) Second, failing to take anything from the victims does not necessarily undermine a conclusion that defendant's motive was to commit a robbery. Indeed, this would not be the first case where an attempted robbery turned deadly, and the killer left the location of his crime without taking the property he initially intended to steal. (See, e.g., *People v. Keith* (1975) 52 Cal.App.3d 947, 952-953.) And finally, setting motive aside, the following circumstantial evidence also supports defendant's identity as the killer: defendant's fingerprints were found not just on the rear door, but also on the driver's door handle; Bautista and Bragg's cell phones were taken; defendant listed two nine-millimeter handguns for sale after the murders, i.e., the same caliber as the weapon used to kill Bautista and Bragg; defendant never returned to his residence after the murders, except to move out a week later; and an analysis of defendant's new cell phone indicates he tried to secure a rental car and used the new phone to search for an airport and hotels in Texas.

Viewing the evidence in its totality, the jury could have reasonably concluded that defendant, after luring Bautista and Bragg to Stockton, got into the back of Bragg's car and directed them to a different location in order to rob them. Defendant was armed with a nine-millimeter handgun for that purpose. About an hour later, something transpired in the car that caused him to instead shoot them both in the back of the head. Defendant then got out of the back seat, opened the driver's door, and took their cell phones to remove any evidence that they had come to Stockton that night to buy a car from him.

9

However, in defendant's apparent haste to leave the place of the murders, he left his own cell phone behind.

In short, we conclude defendant's murder convictions are supported by substantial evidence.

II

*Flight Instruction*

Defendant also claims the trial court prejudicially erred by instructing the jury with CALCRIM No. 372 on flight from the scene of a crime. Not so.

Penal Code section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." The jury was so instructed in this case.

"[A] flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citation.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citation.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Here, as previously discussed, the evidence supports a reasonable conclusion that defendant got out of the back seat of Bragg's car after shooting her and Bautista in the back of the head. He then opened the driver's door and removed their cell phones before leaving the scene of the murders. Importantly, despite taking his victim's cell phones, he left his own cell phone in the back seat of the car, strongly suggesting his departure was a

10

hasty one. Moreover, defendant did not return to his residence after the murders, except to move out a week later, despite the fact that he had paid rent for the entire month. Finally, defendant tried to secure a rental car and used his new cell phone to search for an airport and hotels in Texas. All of this supports a reasonable inference that defendant left the place of the crime under circumstances suggesting his movement was motivated by a consciousness of guilt.

We conclude the trial court did not err in providing the jury with CALCRIM No. 372 on flight from the scene of a crime.

### DISPOSITION

The judgment is affirmed.

_____

HULL, J.

We concur:

_____

ROBIE, Acting P. J.

_____

MAURO, J.

11