Filed 6/2/26  P. v. Cruz CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALFREDO CRUZ,<br><br>    Defendant and Appellant. | G064345<br><br>(Super. Ct. No. 08CF0919)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Kimberly Menninger, Judge. Affirmed.

Law Offices of Allen G. Weinberg and Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A.

Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

Defendant Alfredo Cruz appeals from the trial court's denial of his Penal Code section 1172.6 resentencing petition following an evidentiary hearing.[1] After reviewing testimony and evidence from the trial at which Cruz was originally convicted of second degree murder, the court concluded the People proved, beyond a reasonable doubt, that Cruz is guilty of murder under a direct aiding and abetting theory of implied malice murder. Cruz disputes the sufficiency of the evidence to support that conclusion. However, because substantial evidence supports the court's determination, we find no error in its denial of Cruz's resentencing petition and affirm the challenged postjudgment order.

FACTUAL AND PROCEDURAL BACKGROUND

I.

ORIGINAL CONVICTION

*A. Charges and Trial*

After Luis Rivera was killed outside his own house one evening in 2008, Cruz was arrested and charged with murder. At trial two years later, the prosecution proceeded on three theories: direct aiding and abetting of first degree murder; natural and probable consequences aiding and abetting; and natural and probable consequences conspiracy. The latter two were second degree murder theories. Testimony about what took place on the day in question came from the neighbor who witnessed the events. In addition, the jury watched and listened to a law enforcement interview of the self-

---

[1] All further statutory references are to the Penal Code.

2

admitted actual shooter which took place the morning after the killing. Both sides stipulated the jury could consider his statements as if he testified in court.

       1.  The Neighbor's Testimony

       The neighbor testified he lived in the City of Lake Forest next door to Rivera and they were very close friends. On the night in question, the neighbor was outside saying bye to his girlfriend because he was leaving on a trip with his family. He noticed a black car parked across the street that he did not recognize. He saw two males, later identified as Cruz and Julian Escamilla, through the rolled down front windows of the car; Cruz was the driver and Escamilla was the passenger. The back windows were rolled up and tinted, so he could not see the back seat area.

       Rivera arrived home as the neighbor's girlfriend was leaving and parked halfway into his driveway. Rivera went over to talk to the neighbor, who was standing in the street. As they were talking, three males got out of the black car and approached. The third male, later identified as Edgar Calvillo, came from the back seat on the passenger side of the car. As he walked around the front of the car and approached Rivera, the neighbor saw Calvillo was holding a semi-automatic rifle. Calvillo stopped two to three feet from Rivera, pointed the rifle at Rivera's face, and said, "'I heard you been talking shit, motherfucker.'" The neighbor "was freaking out because [he] saw the gun." He tried to get closer to Rivera, but Cruz physically stopped him and told him the situation was none of his business.

       While Calvillo had the rifle pointed at Rivera, Escamilla took a swing at him. After Rivera swung back, Calvillo "tried to rush" him and then Cruz approached. All three who came in the black car tried to rush Rivera, but Rivera "held his own ground" and "they saw that they couldn't get him."

3

The neighbor's father, who had come outside, repeatedly yelled at the three males to leave. As they retreated to the black car, Calvillo said to Cruz, "'[L]et's go. Fuck these pussies. They are not going to do shit.'"

Cruz got into the driver's seat first and Escamilla got into the front passenger seat next. Lastly, Calvillo got into the rear passenger seat behind the driver—the opposite side from where he previously exited the car. The neighbor and his father approached the driver's side of the car, telling the occupants they did not want any problems and to leave. Calvillo responded by telling them to "'shut the fuck up.'"

As the neighbor and his father walked back toward where Rivera was standing, the neighbor saw Cruz panicking and heard the car start. The engine revved twice "really loud[ly]," but the car stayed stationary. As the car started moving, the neighbor saw the back window roll down and Calvillo stuck part of the rifle out. He heard three gunshots and saw a ball of fire emerge from the window of the moving car. The car never stopped, but instead "kept going really fast down the street." Rivera later died of a single gunshot wound to the chest.

2. Calvillo's Testimony by Videotaped Interview

The morning after the shooting, Calvillo was arrested and interviewed by law enforcement. The video of Calvillo's 90-minute interview was played at trial. Calvillo explained he was friends with Escamilla, who in turn was friends with Cruz. Although he met Cruz through Escamilla about a year prior and would see the two together from time-to-time, Calvillo and Cruz never "hung out" but instead would "just say what's up to each other."

According to Calvillo, on the day in question, Cruz came over to his house in the afternoon with Escamilla and they "had a couple of beers." Cruz said he found out one of three brothers was trying to date Cruz's

4

girlfriend, which made him "really, really mad." He also told Calvillo that the three brothers were accusing Cruz, Calvillo, and Escamilla of slashing the brothers' tires, and the brothers were looking for them and their families. Cruz mentioned he had been set up and jumped by the brothers a few weeks before. Calvillo did not know the brothers, felt he was being wrongly accused, and did not like their families being threatened, so he asked Cruz to take him to where the brothers lived.

Cruz, Escamilla, and Calvillo got into Cruz's car around 8 o'clock in the evening; Cruz was driving, Escamilla was the front passenger, and Calvillo was in the back. Calvillo brought a semiautomatic rifle along because he wanted to scare the brothers. He put the ammunition in the car's trunk and took the rifle in the car. Cruz asked why he was taking the rifle, and Calvillo told him not to worry about it because he was not going to shoot anyone.

The trio drove from the City of Santa Ana to what Calvillo believed was the City of Laguna Hills. After parking across the street from the brothers' house, they waited about five minutes in the car. Rivera came home in his truck, and Cruz identified him as one of the brothers.

Calvillo said Escamilla got out of the car first and started exchanging words with Rivera about the tire slashing accusations. Calvillo got out of the car as well, and Cruz stayed right next to the driver's door. Calvillo made conflicting statements during the interview about the rifle. At first, he said he left the rifle in the vehicle when he initially got out and retrieved it later after Escamilla and Rivera started fighting. Later on in the interview he said he asked Cruz to "[o]pen the trunk real quick" when they first arrived at the brothers' house, and he retrieved the ammunition from the trunk and loaded the rifle before anyone even started talking to Rivera.

5

After Escamilla and Rivera exchanged words, Escamilla threw a punch at Rivera and the two started fighting while Calvillo watched. The physical fighting lasted about 10 seconds, and then Rivera started "running his mouth." Calvillo "got mad," so he pointed the rifle at Rivera's neck but did not shoot. Meanwhile, Cruz was talking to the neighbor who Rivera had been talking to before the altercation began.

Cruz, Escamilla, and Calvillo decided to get back into Cruz's car. The neighbor walked up to the car and told them he had nothing to do with what was going on. Calvillo responded, "All right then, well, it doesn't concern you, I'm not here looking for you." As they were leaving, Rivera "started saying some stuff," yelling at the car. Calvillo got angry and, as the car started to move, "just put the window down and shot him" four times. He said the others did not know he was going to shoot.

After they left the scene, Escamilla was still "kind of heated" and Cruz was "kind of scared." Cruz asked Calvillo, "'Why'd you shoot him?'" and "'Did you get him?'" Calvillo said, "I don't know, I don't think so." They drove back to Calvillo's house. Cruz "couldn't . . . stop thinking about [what had happened] and stop moving around." He said to Calvillo, "'I can't believe you did that.'"

B. *Jury Verdict and Sentence*

The jury found Cruz not guilty of first degree murder, but guilty of the lesser included offense of second degree murder. The trial court sentenced him to 15 years to life in prison.[2]

_____

[2] Cruz's original conviction was affirmed on appeal after this court, at his appellate counsel's request, conducted an independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436, and *Anders v. California* (1967) 386 U.S. 738, and determined there were no arguable issues. (*People v. Cruz* (Feb. 6, 2012, G045010 [nonpub. opn.].)

## II.

### RESENTENCING PETITION

In 2019, Cruz filed a petition seeking to have his murder conviction vacated and to be resentenced under section 1172.6.[3] After the trial court denied the petition at the prima facie stage based on a challenge to the constitutionality of the legislation, another panel of this court reversed and remanded the matter to the trial court for further proceedings. (*People v. Cruz* (Mar. 18, 2020, G057564 [nonpub. opn.].) On remand, the People agreed Cruz met his prima facie burden of showing entitlement to relief under section 1172.6 and, thus, was entitled to an evidentiary hearing.

## III.

### EVIDENTIARY HEARING

In opposing the resentencing petition, the People argued evidence established beyond a reasonable doubt that Cruz was guilty of aiding and abetting implied malice murder, a theory still viable under the amended murder statutes. The parties stipulated to the scope of evidence available for the trial court to consider, which included, inter alia, the transcript and evidence from the original trial, jury instructions from the trial, and the jury's verdict. No new evidence was offered.

After hearing argument from the parties at a May 2024 hearing, the trial court took the matter under submission. It subsequently issued an order denying Cruz's petition based on a determination that he "aided and abetted in the murder with implied malice." The order summarized the

---

[3] The petition was filed pursuant to former section 1170.95, which was subsequently renumbered by the Legislature to section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.)

7

evidence and set forth the applicable law, but did not expressly make any credibility findings or explain the court's reasoning.

Cruz timely appealed.

## DISCUSSION

Cruz challenges the trial court's denial of his resentencing petition, arguing there is insufficient evidence to support the court's conclusion that he is guilty of aiding and abetting implied malice murder. He summarizes his argument as follows: "While the shooting may well have been a reasonably foreseeable consequence give the totality of the circumstances, such reasoning would fall squarely under the natural and probable consequences doctrine that may no longer support liability for murder." We agree a natural and probable consequences theory of murder is no longer viable (*People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*)), but disagree about the sufficiency of the evidence to support the court's direct aiding and abetting determination.

### I.

### APPLICABLE LAW AND STANDARD OF REVIEW

"[A] trial court's denial of a section 1172.6 petition [after an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""" (*Reyes, supra*, 14 Cal.5th at p. 988.)

Reviewing the record for substantial evidence requires us to consider the elements of the murder theory pursuant to which the trial court found Cruz guilty, namely direct aiding and abetting of implied malice

8

murder. (See *Reyes, supra*, 14 Cal.5th at p. 990 [direct aiding and abetting theory of second degree murder still viable after legislative amendments to murder statutes].) "'[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. [And,] [t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Id.* at p. 991.)

## II.

### ANALYSIS

It is undisputed the life-endangering act was Calvillo's discharge of the rifle toward Rivera. Thus, the question is whether there is substantial evidence demonstrating that Cruz knew Calvillo intended to shoot toward Rivera, intended to aid the shooting, knew the shooting was dangerous to life, and acted in conscious disregard for life. (See *Reyes, supra*, 14 Cal.5th at p. 992.) Defendant argues there "is simply no substantial evidence that [Cruz] had the requisite knowledge or intent." We disagree.

The evidence showed Cruz was aware Calvillo brought the rifle and ammunition along with them. Knowing Calvillo put the ammunition in the trunk of the car, Cruz opened the trunk at Calvillo's request before Rivera arrived home. Calvillo loaded the gun and chambered a round before he approached Rivera, all while Cruz was standing nearby. Then Calvillo pointed the rifle at Rivera's face from two to three feet away while using accusatory expletives. When the trio returned to Cruz's car, Calvillo brought the loaded rifle into the backseat with him, sitting directly behind Cruz. Cruz started the car and revved the engine loudly twice without moving, which one

9

could reasonably infer to be an act of aggression. Before the car sped away without turning back, Calvillo was able to roll down the rear window at least six inches and fire three shots, pulling the trigger between each shot. Given these circumstances, combined with the evidence demonstrating Cruz was "really, really mad" about one of the brothers allegedly trying to date Cruz's girlfriend and having been set up by the brothers to get jumped a few weeks prior, one could reasonably infer Cruz knew Calvillo intended to shoot toward Rivera (even if only to "scare" him), aided him in doing so, knew doing so was dangerous to human life, and acted in conscious disregard for human life. Accordingly, substantial evidence supports the trial court's determination that Cruz was guilty beyond a reasonable doubt of aiding and abetting implied malice murder.

Cruz's reliance on *Reyes* is misplaced. There, the defendant rode his bicycle into rival gang territory with fellow gang members, one of whom had a gun, and the group chased after the victim's car. (*Reyes, supra*, 14 Cal.5th at p. 989.) Our high court determined there was insufficient evidence to support the trial court's conclusion that the defendant was guilty on a *direct perpetrator* theory of implied malice murder due to a lack of evidence establishing (1) the proximate causation required for implied malice murder and (2) the necessary danger to human life posed by the defendant's act. (*Ibid.*) Notably, because the trial court made an error of law concerning the elements of direct aiding and abetting implied malice murder, the Supreme Court remanded the matter for further proceedings and "express[ed] no view on the merits of [the defendant's] resentencing petition under a proper application of the elements of implied malice murder on a direct aiding and abetting theory." (*Id*. at pp. 991–992.) Accordingly, *Reyes* does not speak to

10

the issue before us, namely what amounts to sufficient evidence to support an aiding and abetting theory of implied malice murder.

Cruz argues "Calvillo's statement . . . showed [Cruz] had no advance knowledge [Calvillo] was going to shoot." While there was evidence from which one could infer Cruz was not aware of Calvillo's intention to discharge the rifle, the presence of that evidence is not outcome determinative. First, the trial court was not obligated to believe Calvillo's statement. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Second, substantial evidence review means we review the record in the light most favorable to the judgment below, crediting reasonable inferences which favor the trier of fact's findings. (See *People v. Lucero* (2019) 41 Cal.App.5th 370, 411; *People v. Bohana* (2000) 84 Cal.App.4th 360, 368.) Thus, "'"'[i]f the circumstances reasonably justify the trier of fact's findings, [an] opinion . . . that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) Such is the case here.

Because substantial evidence supports the trial court's determination that Cruz was guilty of murder as a direct aider and abettor of implied malice murder, the trial court did not err in denying his resentencing petition. (See § 1172.6, subd. (d)(3).)

11

## DISPOSITION

The postjudgment order is affirmed.


                              DELANEY, J.


WE CONCUR:



MOTOIKE, P. J.



GOODING, J.