Filed 1/10/25  P. v. Galvez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ITALO ERNESTO GALVEZ,<br><br>        Defendant and Appellant. | B332890<br><br>Los Angeles County<br>Super. Ct. No. PA045164 |

        APPEAL from an order of the Superior Court of Los Angeles County, David E. Walgren, Judge.  Affirmed.
        Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.
        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, and Wyatt E. Bloomfield and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

——————————

        Italo Galvez appeals the trial court's denial of his request for resentencing under Penal Code section 1172.6.  We affirm.

Substantial evidence supports the trial court's conclusion that Galvez aided and abetted an implied malice murder. Thus, Galvez is ineligible for the relief he seeks. Citations are to the Penal Code.

## I

We recount the facts and procedural history.

## A

Galvez was a member of the 18th Street gang.

More than 20 years ago, on August 15, 2003, Galvez attended a wake and afterparty for Oscar Cubias, a friend of his and fellow 18th Street gang member who had been killed in a shooting the week before. Also attending were Felicia Gonzalez and 18th Street gang members Eduvino Ramos and Heriberto Carrillo.

Later that day, Carrillo would be shot in the head.

After the party, Carrillo offered to drive Gonzalez home. Gonzalez declined because she did not know Carrillo. Instead, Gonzalez asked Galvez for a ride. Galvez agreed.

Gonzalez saw Galvez put something wrapped in a white robe into the back of his car, a black Chevy Tahoe with paper plates. When Gonzalez asked Galvez what this was, he told her it was an "AK."

Gonzalez overheard Galvez, Carrillo, and Ramos discuss going on a "mission" that night. Gonzalez also heard Carrillo ask Ramos and Galvez, "Oh, we're going to do this tonight?" Ramos and Galvez responded, "Yeah, we're going to do this."

Galvez told Carrillo to get into his Tahoe. Carrillo got in.

Carrillo took the front passenger seat, Ramos sat behind him, and Gonzalez sat behind Galvez on the driver's side.

Galvez dropped Gonzalez off at her grandmother's house just before midnight.

Galvez drove off with Carrillo and Ramos.

Galvez's mother remembered seeing him return to their home between 12:30 am and 1:00 am that night.

## B

Around midnight that same night, and less than two miles away from where Galvez had dropped Gonzalez off, Romel Nunez drove onto the 118 freeway. Nunez saw a dark SUV with paper plates idled along the freeway shoulder. A person was standing near its rear passenger door. At first, Nunez thought this person was dumping trash, but he drew closer and realized it was not trash but a human body. The windows on this car were tinted, but Nunez saw shadows and movements and concluded several people were inside. The person dumping the body got inside and the car left. Nunez reported the situation to police.

Police identified the victim as Carrillo, who died from a gunshot to the back of his head.

## C

Cubias's funeral took place the following morning. Gonzalez and Galvez both attended. After the funeral, Gonzalez went with Galvez to his home so that he could drive her home. Gonzalez saw blood in Galvez's Tahoe. When Gonzalez asked Galvez about the blood, he responded, "Don't worry about it." Galvez began to drive the Tahoe with Gonzalez and others as passengers.

Not long after Galvez pulled the Tahoe out of the driveway of his home, a police car began to follow. Officer Roger Watson was in this patrol car with his partner. When the patrol car

pulled up alongside the Tahoe, Watson saw Galvez matched a description he got from detectives.

Watson and his partner tried to stop the Tahoe, but Galvez sped away at over 70 miles per hour. Watson turned on the patrol car's lights and siren, called for backup, and chased Galvez through a residential neighborhood. Galvez was driving the Tahoe at 65 or faster in a 25 miles-per-hour zone. They ran through stop signs and red lights and nearly crashed a few times. The pursuit ended when Galvez crashed into a postal service truck.

After the collision, Watson saw Galvez run away. Police arrested him later that day.

Police seized Galvez's Tahoe and got a search warrant for his home. Inside Galvez's home, Detective Charles Lenane found tan pants with blood stains.

Lenane returned to the police station. Galvez was already there. Lenane saw some blood stains on the black t-shirt that Galvez was wearing. The blood in the Tahoe and on Galvez's t-shirt matched Carrillo's.

## D

At a preliminary hearing, the court heard testimony from Ronald Raquel, a criminologist in the Los Angeles Police Department. Raquel examined Galvez's Tahoe about a week after the police arrested Galvez. Lenane had asked Raquel to interpret the bloodstains in the Tahoe. He also asked Raquel to determine whether Carrillo was shot inside the Tahoe or whether he had been shot somewhere else and transported in the Tahoe.

Based on the spatter pattern within the Tahoe, Raquel opined that Carrillo was sitting in the front passenger seat when

4

he was shot. He did not offer an opinion on where the shooter was sitting.

Raquel also examined the black t-shirt Galvez had been wearing and the tan pants Lenane had found in Galvez's home. He detected blood spatter on the left sleeve, the right side, and the back of the shirt on the right side. Raquel opined that whoever had been wearing this t-shirt was "in close proximity to a high velocity spatter pattern event" and was sitting in the driver's seat when Carrillo was shot. As for the pants, Raquel said their wearer was also "next to a high velocity event such as a gunshot wound to somebody."

After the hearing, an information charged Galvez with one count of voluntary manslaughter, in violation of section 192(a). The information included allegations that he personally used a gun, under section 12022.5, and that he committed a felony for the benefit of, at the direction of, or in association with a criminal street gang, with the intention to promote, further, or assist in criminal conduct by gang members, under section 186.22.

Galvez pleaded no contest to the voluntary manslaughter charge under section 192(a). He also admitted the gang and gun allegations.

The court sentenced Galvez to serve 26 years in prison: the midterm of six years for the voluntary manslaughter count, ten years for the gang allegation, and ten years for the gun allegation.

Ramos fled and avoided prosecution.

E

In 2022, Galvez filed a petition for resentencing under section 1172.6.

5

Section 1172.6 provides the mechanism by which defendants may seek the relief offered by Senate Bill 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437.)  SB 1437 "amend[s] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

The court found Galvez made a prima facie case for relief, issued an order to show cause, and set an evidentiary hearing. The hearing took place over four days in July 2023.  At this hearing, the court considered the admissible portions of the 2004 preliminary hearing transcript, along with live testimony from Gonzalez, Nunez, and Lenane.  Additionally, each side offered an expert to testify about the evidence that criminologist Raquel, now deceased, had examined nearly twenty years ago.

Gonzalez testified that she did not remember anything, but acknowledged she had participated in a recorded interview with police shortly after Galvez was arrested.

Lenane's testimony included a detailed description of his investigation of Carrillo's death and questioning of Gonzalez shortly thereafter.  Lenane additionally authenticated the transcript of Gonzalez's 2003 interview with the police.

Nunez testified as to his recollection of seeing Carrillo's body being dumped along the freeway.

Then the court heard from each side's expert witness regarding the blood spatter evidence.  Detective Efren Gutierrez testified for the prosecution.  He had been with the police department for over twenty-seven years, received training in

bloodstain pattern analysis, been the lead detective in over one hundred homicide cases, had worked on over two hundred homicide cases, and previously qualified in court as an expert in bloodstain pattern analysis at least ten times.

Gutierrez opined that based on the evidence, there was no one seated in the rear seats of the Tahoe when the shooting occurred. If someone had been seated in those rear seats, he would expect an absence of any blood spatter stains or at least a discernable pattern. Instead, there were "a lot" of blood spatter stains.

Gutierrez, whom the trial court accepted as a gang expert based on his work as a gang detective, also testified that a "mission" means committing a crime to benefit a gang. He further testified that multiple gang members go on "missions" so there is at least one witness who can vouch for the gang member who actually committed the crime.

The defense expert, Keith Inman, has a bachelor's degree and master's degree in forensic science, published two books on forensic science, authored several peer reviewed papers, has worked with public and private crime laboratories, and is a tenured associate professor teaching blood stain pattern analysis every semester. Inman has testified in court as a blood spatter expert between 15 and 25 times throughout the country, including in California.

Inman pointed out that Raquel had testified there were "many stains" he did not document, and that "we don't have what amounts to [Raquel's] knowledge of what was in that car," as Raquel was in the best position to interpret the evidence. Inman agreed with Raquel's assessment that Carrillo was most likely in the front passenger seat when he was shot. He also agreed the

7

evidence was consistent with whoever was wearing the black shirt and tan pants sitting in the driver's seat of the Tahoe when Carrillo was shot. However, he opined that the evidence also supported the scenario in which someone in the back seat shot Carrillo, because there were multiple reasonable ways to interpret the blood spatter in the rear seats. Inman's "bottom line is that this is so complicated, you cannot put the shooter anywhere in that car."

The court found both Inman and Gutierrez to be credible witnesses who were "quite consistent with one another as to the basic blood spatter evidence."

Citing the "state of the evidence of the blood spatter [and] the lack of complete documentation or photographs taken back when this was a pending case," the court stated that it could not "find beyond a reasonable doubt [that Galvez] could be prosecuted as the actual killer."

However, the court found the prosecutor had established beyond a reasonable doubt that Galvez "could still be prosecuted as a direct aider and abettor under the still valid theory of implied malice." The court cited the following facts to support its finding: "[Galvez's] stated admission that he was putting a gun in the car, he said it was an AK, that he was going on a mission, that it was his car, that he was the driver, that he told the victim to get in the car, that he pulled over for purposes of the body dump, that he quickly drove away from the location, that he evaded the police the very next day." Finding Galvez ineligible for resentencing, the court denied his petition. Galvez appealed.

## II

Aiding and abetting an implied malice murder remains a valid theory of homicide notwithstanding the changes wrought by

8

Senate Bill 1437 and Senate Bill No. 775.  (*People v. Gentile* (2020) 10 Cal.5th 830, 850.)  *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) explained the elements as follows: "direct aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.]  In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act." (*Id.* at pp. 712–713, fn. omitted.) Specifically, "the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act,* not the result of that act" to be liable for implied malice murder. (*Id.* at p. 713, italics in original.)  Further, the direct aider and abetter must "personally harbor" the mens rea: "knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*Ibid.*, italics in original, fn. omitted.)

We deferentially review the trial court's fact finding.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  Our job is to determine whether any substantial evidence supports a rational fact finder's findings beyond a reasonable doubt. (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 97 (*Didyavong*).)

In doing so, we accept the trial court's determinations on witness credibility and evidentiary conflicts, along with any logical inferences it may have drawn from the evidence. (*Didyavong*, *supra*, 90 Cal.App.5th at p. 97.)  We will not reverse the trial court unless there is no hypothesis upon which sufficient substantial evidence exists to support its decision.  (*Ibid.*)

9

On appeal, Galvez argues the evidence was insufficient to support the trial court's finding that he aided and abetted murder, claiming that "[t]he circumstantial evidence relied on by the court is consistent with several different potential factual scenarios, none of which is any more likely than the others." He suggests that perhaps the shooter acted on his own, without any warning to Galvez of his intentions, or that the shooter shot Carrillo by accident. Thus, according to Galvez, because there is no direct evidence of what actually happened in the Tahoe when the shooting occurred, the trial court's theory of the case with respect to his "*mens rea* and *actus reus* at the moment of the shooting is based on nothing more than speculation."

We reject these arguments. Circumstantial evidence can be substantial evidence. (See *People v. Maury* (2003) 30 Cal.4th 342, 396 ["An appellate court must accept logical inferences that [the fact finder] may have drawn from the circumstantial evidence"] .) Because it is rare that a defendant would provide direct evidence of their mental state, we may look to circumstantial evidence to determine if Galvez acted with the requisite mental state. (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 502.) We agree with the trial court that there was substantial evidence of Galvez aiding and abetting the implied malice murder of Carrillo.

Here, the act dangerous to human life was the shooting of Carrillo in the head. We assume, without deciding, that Galvez was not the actual shooter of Carrillo. Nonetheless, if Galvez aided and abetted the shooting of Carrillo, Galvez shares in the guilt of the actual perpetrator. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) That is because the aider and abettor's liability is based on the combination of the actus reus of the

10

participants and the aider and abettor's own mens rea.  (See *People v. Reyes* (2023) 14 Cal.5th 981, 990–991 (*Reyes*).)

Substantial evidence supports the trial court's finding that Galvez, by his words and conduct, aided the shooting of Carrillo, thus satisfying the actus reus requirement for aiding and abetting implied malice murder.  (See *Powell, supra*, 63 Cal.App. 5th at p. 713.)  Galvez put a gun in the Tahoe.  Galvez told Carrillo to get into the Tahoe and then, as its driver, controlled the Tahoe.  Galvez was present when Carrillo was shot in the Tahoe: Carrillo's blood was on his clothing.

Substantial evidence also supports the trial court's finding that Galvez "personally harbor[ed]" knowledge of the shooter's intentions, intended to aid the shooter, and acted in conscious disregard for life.  (See *Reyes*, *supra*, 15 Cal.5th at p. 992.)  Galvez's discussion of going on a "mission" with Ramos shows he was aware he would participate in a gang-related gun crime that evening.  Galvez told Gonzalez the object he had placed in the Tahoe was a gun.  Galvez was in control of the Tahoe when the shooter shot Carrillo.  Galvez drove the Tahoe away after Carrillo's body was dumped along the highway.  Galvez led the police on a high speed pursuit through a residential neighborhood the day after the murder.  Galvez caused several near collisions during this high speed pursuit.  Galvez crashed the Tahoe into another truck with three passengers inside while he fled on foot.  From these facts, it was reasonable for the trial court to infer that Galvez had the requisite mental state for aiding and abetting the implied malice murder of Carrillo.  (See *People v. Villagrana* (2024) 106 Cal.App.5th 312, 319 [upholding a trial court's finding that a section 1172.6 petitioner acted with malice

11

notwithstanding the prosecution's pretrial offer of a plea to manslaughter with the admission of gun and gang allegations].)

The alternative scenarios Galvez posits—that the shooting was an accident or that the shooter acted without Galvez's awareness or assistance—are speculative.  No evidence supports them.  They are not reasonable inferences one could make from the circumstantial evidence.  (See *People v. Bohana* (2000) 84 Cal.App.4th 360, 369 ["Somewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails.  When this happens, the inference becomes irrational speculation"].)

## DISPOSITION

We affirm the trial court's order.


WILEY, J.


We concur:


STRATTON, P. J.


VIRAMONTES, J.

12